## In re CERTAIN PROCEEDINGS BEFORE the 1959 GRAND JURY.
## In the Matter of the Contempt Proceedings Against Armando PIEMONTE, Respondent.
## GJ No. 10507.

United States District Court
N. D. Illinois, E. D.
Jan. 14, 1963.

824

Melvin B. Lewis, Chicago, Ill., for respondent.

CAMPBELL, Chief Judge.

This matter is now before me again on motion of respondent, Armando Piemonte, to reduce a sentence of 18 months heretofore imposed upon him by me for contempt of court.

In 1958 respondent was sentenced to a term of six years for conviction of two sales of heroin. On August 10, 1959, while incarcerated in a federal prison, respondent, pursuant to a writ of habeas corpus *ad testificandum,* appeared as a witness before the Federal Grand Jury of this District. He was permitted to consult with counsel and thereafter the Grand Jury asked him questions relating to general trafficking in narcotics and more specifically to the source of his heroin in the past. He declined to answer any of the questions, other than the giving of his name and an admission of his imprisonment, claiming privilege under the Fifth Amendment. Pursuant to Title 18 U.S.C. § 1406 the Government filed an application with this Court stating that the Grand Jury was investigating illegal trafficking in narcotics, and that it was in the public interest that respondent be granted immunity to testify before the Grand Jury concerning violations of the narcotic laws.

After full hearing in open Court, I granted the Government's application, and advised the respondent and his attorney that he now had immunity and

accordingly directed him to answer the Grand Jury's questions. I explained my ruling and its possible consequences to him and admonished him that failure now to comply could result in his being cited for contempt of court. After conferring again with his attorney, respondent once again appeared before the Grand Jury and once again declined to answer questions upon the ground that the answers thereto would tend to incriminate him.

Thereupon the entire Grand Jury presented the respondent in open Court advising me of his continued refusal to answer the questions asked. I again gave respondent a further opportunity to comply with my order and upon his continued refusal I entered an order upon him to show cause why he should not be held in criminal contempt. At the subsequent hearing, in which respondent was again represented by counsel, the only reason offered for his refusing to testify was a claimed fear for his own safety and the safety of his wife and children. I repeatedly requested of him that he obey the Court order, only to be met by his persistent refusal. The hearing accordingly proceeded concluding on August 18, 1959, when I found respondent to be in contempt of court and imposed the consecutive 18 month sentence now sought to be reduced.

On September 2, 1959, the same Grand Jury indicted the respondent for violations of the narcotic laws. On later motion of the Government however, this indictment was dismissed. The respondent appealed the contempt judgment and sentence. Both were affirmed by the Court of Appeals (7 Cir., 276 F.2d 148) and by the Supreme Court (367 U.S. 556, 81 S.Ct. 1720, 6 L.Ed.2d 1028).

In his present motion seeking a reduction in sentence I note that the supporting reasons advanced by respondent are in effect solely the argument and reasoning contained in the dissenting opinions of the Supreme Court at the time it affirmed this contempt sentence. Piemonte v. United States, 367 U.S. 556, 561,

81 S.Ct. 1720, 6 L.Ed.2d 1028. I am, accordingly, now presented with the unfortunate and unpleasant task of being required to comment on some of the thoughts and philosophy found in the dissenting opinions of learned Justices of the Supreme Court. In order properly to consider this motion in the manner it is argued by his counsel I am obviously presented no other alternative.

The arguments found in the Supreme Court dissenting opinions, now espoused and offered by the respondent, seem to be either basically legal or sociological in nature. I shall therefore consider *seriatim* first the legal and then the sociological contentions as advanced in respondent's brief.

Initially, it is urged that a judge should not possess a summary contempt power, but, rather that a jury trial should be granted in such cases. Although I personally would welcome a jury to relieve me of the grave responsibility cast upon me in matters of this nature, the present state of the law does not permit such a course of action. The rationale behind the law on this subject seems predicated upon the trial judge's first-hand knowledge of the factual circumstances generally related to contempt actions. The power of a judge to exercise summary contempt power is regarded as fundamental and as necessary to our common law heritage as is the privilege against self incrimination. Anglo-American legal history fails to indicate either the need or the desirability of a jury trial in a contempt proceeding. I cannot see where my following the law in conducting a bench trial in this case now warrants a reduction of sentence on this ground. As to the gratuitous and irrelevant references to police state methods, I might observe that those who crusade, even with justification and quite properly for individual rights and liberties and against an imaginary police state, should not on the other hand close their eyes to the individual's corresponding fundamental duties to society as a whole, and thus aid in bringing about the

antithesis of the police state, the policeless state.

[2, 3] The second legal contention seems to suggest that this contempt action in effect sought to compel testimony which could not have been compelled at respondent's original trial. This contention is obviously correct. At the original trial the respondent, being a defendant in a criminal trial, could refuse to take the witness stand during his own prosecution, or if appearing as a witness in his own defense could have declined to answer questions such as those involved herein, rightfully claiming his privilege against self incrimination. However, neither of these two situations existed at the time of his trial and sentence for contempt of court. Not being a criminal defendant, he could be and was properly called as a witness and therefore had a duty to give testimony. As to the extent and nature of his testimony, it is, of course, correct that he, as all witnesses, may refuse to disclose information which could tend to incriminate him. However, as a result of my order granting him immunity, respondent could not possibly incriminate himself in any way by his testimony to the Grand Jury. Such an expurgation of the possible crime obviously removes the privilege against self incrimination. This is as it should be, for the privilege exists only to protect against the legal consequences of criminal conduct and, having once removed or taken away the legal consequences, so also the privilege is removed. Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511. Clearly the patently obvious legislative purpose in the enactment of Sec. 1406 was to provide such a method by which testimony could be secured without fear of a witness implicating himself.

■■ Thirdly, in the legal category, I consider the suggestion that my finding of respondent in contempt of court violated the spirit of the Double Jeopardy Clause of the Fifth Amendment. A defendant is placed in former or double jeopardy when he is tried a second time for the same offense which was the basis of a former prosecution. Respondent's criminal contempt sentence resulted from his failure to obey a lawful court order. Neither his initial narcotics conviction, nor for that matter, his subsequent indictment were based upon the same acts for which I found him in contempt. The acts and offenses which formed the basis for his convictions were definitely not the same, and therefore in no way justify any consideration of the issue of double jeopardy.

■ So much for the legal issues raised. Now, as to the sociological arguments offered in support of this motion for a reduction of sentence and found in the dissenting opinions of the Supreme Court. I consider first the argument initially suggested by the respondent prior to my imposition of sentence. In effect this is that his life and the lives of his family would be in danger were he to testify. Admittedly this could in no way be considered legal grounds justifying his refusal to obey a lawful court order. Nor do I find moral or sociological value in this attempted justification. In the first instance, it is the respondent himself, who by his ruthless disregard of the lives of other children whom he helped to lure into dope addiction, is the cause of and who has brought about his now so eloquently deplored and unenviable position. What is not stated in this sympathetic eloquence is the consideration which must be given to the protection of society in general. It has been found that respondent's testimony, if given, would have aided Federal law enforcement officers in their difficult fight against "dope pushers". As stated heretofore, society must of course refrain from offending the personal rights of individuals, but accordingly, individuals must also be considered to owe certain obligations to society. It would indeed be refreshing for a change to hear a few expressions of sympathy and appreciation, from these strong advocates of the rights of criminals, for the Federal Agents who daily risk their lives to de-

fend society from the ever increasing violent activities of such criminals. Secondly, assuming *arguendo* actual moral and sociological merit to respondent's claim, still his fears are, at best, conjectural. His fears presume first the existence and secondly an understanding, of the underworld reprisal system, and thirdly, that this system will be successful. On the other hand society is not dealing with mere conjecture when it is confronted by the continued increase in the law enforcement problems related to illegal narcotic traffic and dope addiction; this fear of society is actual. Fear of underworld reprisals can not and should not serve to justify recalcitrance by witnesses.

Still another sociological argument aims itself at the Government's purpose in creating the situation which led to respondent's contempt conviction. In this regard it is suggested that the Government's intention was to further punish the respondent. Having been present and possessing firsthand knowledge of much of the conduct and circumstances which resulted in the contempt sentence, I cannot join in this belief. Quite the contrary, I am of the opinion that the Government had little interest in taking further action against the respondent. It was the Government which sought immunity for the respondent. Such immunity if accepted would have precluded further action against the respondent. It was the Government also which dismissed the subsequent indictment voted against the respondent by the Grand Jury. The overriding purpose of the Government in conducting this entire investigation was not to further punish those already serving sentences for narcotic offenses, but rather to secure evidence against the overlords who rule the horrible business of supplying illegal narcotics. Its intention was to stop those who are responsible for the Piemontes and the many unfortunate addicts who are in jail as victims of the vile narcotics empire. To this end the Government needed the aid of Piemonte and others like him. To this end the Congress of the United States saw fit to enact Sec. 1406. Unfortunately, not as much for respondent as for society, the Congressional intent and the purpose of the Government's investigation were thwarted by this respondent.

I now consider the contention that respondent, at the time of my imposition of sentence, was already paying his debt to society. I cannot help but observe, since we are discussing sociology rather than law, that statements such as this which consider a defendant's service of sentence as the *quid pro quo* or the payment of a debt to society, are as unsound sociologically as they are legally. Clearly they are not in accord with modern thinking of competent penologists and social workers as to the purpose of incarceration. Of the four basic theories on imprisonment the "paying of one's debt to society", or ancient "eye for an eye" theory, is conceded to be the most unsound. The remaining three theories are much more in keeping with present thoughts on sentencing. (That the sentence should act: 1) as a deterrent to others, 2) to incapacitate the offender and protect society and, 3) to rehabilitate the offender.) The same Congress that enacted the immunity statute which respondent rejected herein has by its legislation in creating Sentencing Institutes and modernized sentencing techniques shown a much more progressive attitude than that expressed in respondent's brief. Nor can this outmoded theory of revenge be found anywhere in the excellent administration of the Federal Prison System today. Under the enlightened and progressive leadership of the present Director of the Bureau of Prisons aided by his well trained and highly professional staff our Federal Institutions lead the entire world in the humane application of the rehabilitative as opposed to the retributive principle in correctional science. It was quite obvious that the respondent had not yet spent sufficient time to benefit from this type of treatment when he chose to protect his dope syndicate overlords rather than society during his Grand Jury appearances.

Finally, it is contended that respondent's subsequent indictment, a fact not known by me at the time I imposed the contempt sentence, should now by reason for me to reduce this sentence. I fail to see how a subsequent indictment can be urged as constituting a matter in mitigation or extenuation, particularly where as here, it has been dismissed by the Government. Quite to the contrary, under certain circumstances such a fact known to a sentencing judge could well be considered as a matter in aggravation.

In conclusion, I find much maudlin sentimentalism and absolutely no merit to respondent's arguments in support of his motion for a reduction of sentence and accordingly the motion is hereby denied.