**In the Matter of the Grand Jury Subpoena served upon Pedro ARCHULETA.**

**No. M11–188.**

United States District Court,
S. D. New York.

May 27, 1977.

See also, D.C., 434 F.Supp. 325.

Robert B. Fiske, Jr., U. S. Atty., New York City, of counsel, Thomas E. Engel, Asst. U. S. Atty., New York City, for plaintiff.

Joan Friedland, Santa Fe, N.M., for Pedro Archuleta, of counsel, Jose A. Lugo, New York City, Dennis Cunningham, Chicago, Ill.

## MEMORANDUM

LASKER, District Judge.

On November 23, 1976 Pedro Archuleta, a resident of Tierra Amarilla, New Mexico, was subpoenaed to testify before a federal grand jury in the Northern District of Illinois (the "Chicago grand jury") investigating bombings in that district believed to have been committed by members of the Fuerzas Armadas de Liberacion National ("F.A.L.N."). On December 23, 1976 he was served with a second subpoena from that grand jury, ordering him to provide fingerprints, a photograph and palmprints to the Chicago grand jury. After being sworn before that grand jury, advised that he was a "suspect" in its investigation and of certain constitutional rights, the witness refused to respond to the grand jury's questions. On the government's motion to hold

Archuleta in contempt, he raised numerous objections to the government's good faith in calling him as a witness; to illegal wiretapping which he claimed underlay the subpoenas and questions; and to the array of the grand jury. These matters are currently being litigated in the Northern District of Illinois.

On March 29, 1977 Archuleta was served with a subpoena ordering him to appear and testify before the grand jury of the United States District Court for the Southern District of New York (the "New York grand jury"). On April 4, 1977 he moved to quash this subpoena or stay these proceedings until the Chicago litigation is concluded, on the following grounds:

"(a) the subpoena to the New York Grand Jury is an attempt to circumvent the proceedings which are currently taking place in Chicago;

(b) The subpoena to the New York grand jury is directed to Movant, a target of the Chicago proceedings, who has stated publicly that he will refuse to testify, and is thus an attempt to incarcerate him without affording him the rights of an accused;

(c) The issuance of two simultaneous subpoenas in different Districts is unduly harassing, burdensome and coercive and as such deprives Movant of due process by requiring him to litigate and placing his freedom in jeopardy in two distinct jurisdictions conducting duplicative investigations;

(d) The issuance of the New York subpoena is an attempt to prevent Movant from litigating the serious jury composition issue which is currently before the District Court in Chicago;

(e) The issuance of the New York subpoena is an attempt to manipulate the situs of the investigation or to 'shop' for a favorable forum on the part of the FBI and the Department of Justice;

(f) the subpoenas—process of a judicial body—are being used by the executive arm of government, in violation of the separation of powers doctrine to coerce, intimidate and incarcerate Movant."

In addition, he moves to quash the subpoena on the following grounds:

"(a) The composition of grand juries in the Southern District shows a serious underrepresentation of Hispanic peoples and thus deprives Movant of Due Process;

(b) The subpoena constitutes an abuse of the grand jury process in that it seriously threatens Movant's First Amendment rights of association and the free expression of political beliefs . . .

(c) The subpoena constitutes an abuse of the grand jury process in that the grand jury is performing the executive function of locating fugitives in violation of the separation of powers doctrine."

The government responded to this barrage of claims with a memorandum of law and two sets of affidavits. The first affidavit, denoted the "open" affidavit, was submitted by Assistant United States Attorney Thomas Engel and describes the nature of the grand jury's investigation in New York and its reasons for calling Archuleta. In essence, the New York grand jury is investigating bombings believed to have been committed by the F.A.L.N.; one person allegedly responsible for the bombings was a member of an organization—the National Commission on Hispanic Affairs of the Protestant Episcopal Church—to which Archuleta belonged in 1972–73. In addition to the "open" affidavit, the government filed under seal *ex parte* affidavits from Engel and an FBI agent. Movant has objected to these *ex parte* submissions; however, the court has not read the *ex parte* material in the belief that wherever possible matters should be decided without reference to information not subject to adversarial comment and rebuttal.

After the government response was filed, but before argument on the motions, a news story appeared in the April 17, 1977 New York Times concerning these grand jury investigations into the F.A.L.N. bombings which was based in part on nonpublic information attributed in the article to law enforcement sources. Some of the previously undisclosed information concerned Archuleta directly and was of a highly ad-

verse character. On April 19th Archuleta filed an "Additional Motion to Quash and/or for a Stay and/or Hearing on Governmental Misconduct" on grounds relating to the disclosure of information. The government has responded by affidavit and oral argument to this aspect of the motion to quash as well.

Finally, Archuleta moved in early May to amend his motion to quash to add a claim that the subpoena to him resulted from information gathered by illegal electronic surveillance. The government has not yet responded to this motion.

In addition to the motion to quash, four motions to intervene have been filed by: The Board of National Ministries of the American Baptist Church; Nelson Canals, a law student at the University of Puerto Rico and Secretary General of the Committee to Free the Five Puerto Rican Political Prisoners; several ministers of churches in Puerto Rico; and by a collection of some 10–15 organizations and as many individuals claiming various and diverse interests in the outcome of the litigation. The government opposes all the motions to intervene.

Archuleta's motion to quash is another in a series of recent challenges brought by persons subpoenaed by the federal grand jury investigating the bombing at Fraunces Tavern on January 24, 1975, and other bombings believed to have been committed by the F.A.L.N. In January of this year, grand jury subpoenas were issued to Bishop Milton Wood, and to Maria Cueto and Raisa Nemikan, all members of the National Hispanic Commission of the Protestant Episcopal Church. Both Cueto and Nemikan moved before Judge Pierce to quash these subpoenas on the grounds, *inter alia*, that their First Amendment rights to free exercise of religion and free association were being violated. On February 4, 1977 Judge Pierce denied the motions and ordered Nemikan and Cueto to testify. *In re Grand Jury Subpoena of Wood et al.*, 430 F.Supp. 41 (S.D.N.Y.1977). Each refused to testify on Fifth Amendment grounds and each was granted immunity. They persisted in refusing to testify and on the government's motion to hold them in contempt, brought before Judge Frankel, argued that the immunity conferred was inadequate to protect Fifth Amendment rights and that the questions put were unlawfully derived from illegal wiretapping. Cueto also raised again the First Amendment objections ruled on by Judge Pierce. After submission of affidavits by the government, Judge Frankel ruled that no illegal wiretapping had occurred, rejected contemnors' other claims and held them in contempt. This order was affirmed by the Court of Appeals. *In re Cueto and Nemikan, Grand Jury Witnesses*, 554 F.2d 14 (2d Cir. 1977). Nemikan and Cueto remain in custody in civil contempt of the grand jury.

## I.

■ Archuleta argues that the subpoena should be quashed because the grand jury has been drawn from an array from which a cognizable group—consisting of Latino and Hispanic Americans—has been systematically excluded, in violation of constitutional and statutory requirements. See U.S.Const.Am. 5; 28 U.S.C. § 1861 *et seq.* The witness also moves at this time for production by the Clerk's office of certain "information, books and records concerning selection, qualification and summons of people for jury service in this District, in accordance with the provisions of . . . 28 U.S.C. § 1867(d) and Article X of the 'Jury Plan' now in operation in this district," for use in connection with his challenge to the array. The government opposes Archuleta's application, on the ground that as a witness he lacks standing to challenge the composition of the grand jury.

The Federal Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, declares it to be the "policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community." Although the statute is not intended to require "precise proportional representation" of every minority and majority group in society, it is intended to assure that no "cognizable

group" is systematically excluded from grand jury service. See *United States v. Jenkins*, 496 F.2d 57 (2d Cir.), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1974). The Act further provides that "No citizen shall be excluded from service as a grand . . . juror . . . on account of race, color, religion, sex, national origin or economic status." 28 U.S.C. § 1862.

To achieve these ends, every district court is required by 28 U.S.C. § 1863 to adopt a plan for the selection of grand and petit jurors, which must provide for use of voter registration or actual voter lists; the plan must also provide for alternative sources of names of eligible jurors in addition to the voter lists "where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 . . ." In accordance with the statute, the Southern District of New York has adopted a plan which provides for the drawing of at least 4,000 names from the registered voters list at random every four years, which names are placed in a "master wheel." Out of this array grand juries are composed by drawing names at random from the master wheel. The wheel is supplemented by additional random drawing of names when necessary and emptied every four years. At that time a new set of names is placed in the wheel from an updated voter registration list. When persons are called to serve as jurors, they are required to fill out a form indicating possible bases for exemption from service, in accordance with 28 U.S.C. § 1865.

Archuleta claims that in the disposition of requests for exemptions, and in reliance on the voter registration lists themselves, this district's grand jury selection procedures systematically exclude Latino and Hispanic people. (Supplemental Affidavit of Joan Friedland). In support of this claim, Dennis Cunningham, one of Archuleta's counsel, swears on information and belief that in 1972 when the "proportion of Latinos in the general population of the District . . . was 10.56%, the number of Latinos who served was 27 out of 715, or 3.77%." Archuleta also claims that Latino and Hispan-

ic peoples are "undercounted" in the census for various reasons, and that the disparity between their representation in the general population and on grand juries is even greater. (Chrissman Affidavit)

To insure compliance with the Jury Selection Act, 28 U.S.C. § 1867 provides that various persons may move to challenge the composition of grand or petit juries. A "defendant" or the Attorney General of the United States in a criminal case may move before trial to dismiss the indictment or stay proceedings on "the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury," § 1867(a), (b), and "in civil cases . . . any party may move to stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the petit jury." § 1867(c). Archuleta argues that however his status is defined, he must be a party in either a civil or criminal case for purposes of § 1867; he thus claims a right to discovery of the grand jury records pursuant to § 1867(d), which provides that:

"(d) Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title."

Section 1867(f) of the Act prohibits disclosure of grand jury selection records for the wheel currently in use, "except pursuant to the district court plan or as may be necessary in the preparation or presentation of a motion under subsection (a), (b) or (c) of this section." [1] Disclosure of grand jury selection records in violation of this prohibition is punishable by up to one year in prison. It is therefore evident that Congress intended not to permit disclosure of the type sought here unless the applicant is entitled to move under § 1867(a), (b) or (c) to challenge the grand jury array.

Archuleta seeks to bring himself within the statute by arguing that the intent of the legislation was to insure "all litigants" an opportunity to challenge the grand jury's composition, and that he is a "litigant" before the grand jury. 1968 U.S. Code Cong. & Admin.News, p. 1792. There is no doubt that if the word "litigant" means only "one who is litigating a matter", then Archuleta is a "litigant" since he is vigorously contesting the validity of the subpoena issued. However, the words of the statutory declaration of purpose make clear that the rights secured by the Act are secured only to "all litigants" of a certain type: namely, "all litigants in Federal courts entitled to trial by jury." 28 U.S.C. § 1861. As a witness subpoenaed to appear before the grand jury, Archuleta is not at this time entitled to a trial by jury on any matter relating to the subpoena. He is therefore not within the class of "litigants" whom the Act was designed to protect.

This conclusion is supported by the specific language of 28 U.S.C. § 1867(a) and (c). Subsection (a) gives to "a defendant in a criminal case" the unqualified right to challenge the grand jury array as not in compliance with the statute. Archuleta, however, has not even been named as a "target" of the investigation in New York, and is in no sense a "criminal defendant" "entitled to trial by jury." Nor is Archuleta a "party" in a "civil case" within the meaning of subsection (c), which grants the right to challenge only the selection of the "petit jury." Failure to specify that a civil litigant moving under subsection (c) could challenge the grand, as well as the petit jury, indicates that Congress did not intend to include within its definition of parties in civil cases a witness appearing before the grand jury.

We therefore conclude that Archuleta lacks standing under the *statute* to challenge the grand jury array at this time. This conclusion does not necessarily mean that he lacks standing as a witness to raise a *constitutional* challenge to the grand jury composition. The Act specifies that its procedures are the exclusive means by which a defendant in a criminal case, the Attorney General of the United States or a party in a civil case may challenge grand or petit juries; but it also specifies that its own remedies are not exclusive, providing that "Nothing in this section shall preclude any person or the United States from pursuing any other remedy, civil or criminal, which may be available for the vindication or enforcement of any law prohibiting discrimination on account of race, color, religion, sex, national origin or economic status in the selection of persons for service on grand or petit juries." 28 U.S.C. § 1867(e).

In deciding whether a witness has standing to challenge on constitutional grounds the composition of a grand jury on a motion to quash the subpoena, it is appropriate to consider the range of factors set forth in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). These include the nature of the witness' interest which is claimed to be invaded or injured; the social interests to be served by permitting a witness to invoke a particular rule or remedy; and the disruption to the legitimate ends of the grand jury which might ensue. Balancing these factors, we conclude that the Constitution does not require that a witness in Archuleta's position be permitted to challenge the composition or selection of the grand jury.

---

1. The District Plan provides for disclosure under the same circumstances, and no others, specified in the statute.

Archuleta relies primarily on *United States ex rel. Chestnut v. Criminal Court of the City of New York*, 442 F.2d 611 (2d Cir. 1971) to support his standing to raise this challenge.[2] Petitioners there sought a writ of habeas corpus releasing them from a state sentence for criminal contempt of the grand jury for refusing to answer questions. In a footnote, the Court of Appeals, while "agreeing with the premise that the grand jury assumes its greatest responsibility in deciding whether to indict," nevertheless held "that petitioners may challenge the composition of the 1964 grand jury." 442 F.2d at 615, note 7. The court explained:

"The grand jury's inquisitorial function offers many opportunities for the use of discretion. Here, for example, the decisions to question, to grant immunity, to phrase questions in yes-or-no fashion, and finally to initiate punishment for contempt, affected substantial interests of the petitioners and were neither inevitable nor ministerial."

"In particular," the court went on to note that:

"the grand jury might have chosen to proceed against the recalcitrant petitioners under [a law] providing a statutory maximum penalty of 30 days' imprisonment . . .. Instead, the grand jury ordered the filing of informations charging criminal contempt under former Penal Law § 600(6) punishable by up to a year's imprisonment."

The court apparently concluded that a witness, like a defendant, could suffer from the possibility of actual bias which might influence an unfairly constituted grand jury's exercise of its inquisitorial functions.

The *Chestnut* decision does not discuss the relative importance of certain factors on which it may have relied and which are absent in this case. Foremost among these is that the present challenge arises on a motion to quash the subpoena. The witness has not yet refused to testify, has not yet

been held in contempt, and thus has suffered no present injury arising out of the grand jury's subpoena. The possibility that no such injury will ever occur suggests that consideration of the challenge may be premature, even under *Chestnut*. In addition, in federal grand jury proceedings it is the United States Attorney's office which makes the decision to seek immunity for a witness, and the court (not the grand jury) which grants immunity; the decision to move to hold a witness in contempt is also made by the United States Attorney. These limitations on the grand jury's discretion in handling a recalcitrant witness may warrant a conclusion that the witness' interest in the unbiased exercise of the federal grand jury's function is not sufficiently great to warrant his raising a challenge to its composition.

There is no denying, however, that even in the federal system a grand jury exercises substantial discretion in calling and questioning witnesses, and that under the reasoning of *Chestnut*, such a witness has a constitutionally protected interest in assuring that the grand jury is not tainted by the impermissible exclusion of racial or ethnic groups. It is necessary, nonetheless, to reconsider *Chestnut* in light of subsequent rulings in related areas by the Supreme Court and other circuits. In *United States v. Calandra, supra*, 414 U.S. at 345, 94 S.Ct. 613 (decided three years after *Chestnut*), the Court quoted extensively and with approval from *Blair v. United States*, 250 U.S. 273, 281–82, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). In *Blair* the Court had held that a witness could not refuse to testify before the grand jury on the ground that the particular grand jury lacked jurisdiction to investigate the acts in question or that the statute defining the criminal conduct under investigation was unconstitutional. The *Blair* court gave a restricted reading to the matters which a witness could raise in defense of a contempt charge:

---

**2.** The District Court in Chicago has permitted Archuleta to litigate a similar challenge to the grand jury composition. It is not clear, how-

ever, whether the government there even raised the question of his standing to do so.

"there is a constitutional exemption from being compelled in any criminal case to be a witness against oneself . . . some confidential matters are shielded from considerations of policy, and perhaps in other cases for special reasons a witness may be excused from telling all he knows.

But aside from exceptions and qualifications . . . the witness is bound not only to attend but to tell what he knows in answer to questions framed for the purpose of bringing out the truth of the matter under inquiry.

He is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise for this is no concern of his.

*On familiar principles, he is not entitled to challenge the authority of the court or of the grand jury, provided that they have a de facto existence and organization.*" (emphasis added)

The latter sentence was specifically quoted with approval in *Calandra, supra,* and broadly read seems to require that Archuleta's claim be rejected.[3]

In *Calandra,* the Court held that a witness called before the grand jury could not refuse to testify on the ground that the basis for the questions put was derived from evidence obtained in violation of the Fourth Amendment; in other words, that the exclusionary rule did not apply in grand jury proceedings. The Court weighed heavily the disruptive effect permitting such challenges would have on the grand jury:

"Permitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings. Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective.

The probable result would be 'protracted interruption of grand jury proceedings.'"

This reasoning applies *a fortiori* to challenges to the composition of the grand jury. Proof of systematic exclusion is a difficult and time consuming process, as is defending against such a challenge; litigation of this sort might frequently be expected to exceed or seriously invade the life of a grand jury.

*Calandra* does not control disposition of the question before us; certain interests considered relevant there are obviously different from those here at stake. The Court, reasoning that the "exclusionary rule" was adopted solely in order to deter illegal police conduct, decided that it was necessary to ascertain what deterrent values would be served by prohibiting use of that testimony before the grand jury. It concluded that little additional deterrent effect would be achieved and that the social interest in deterring illegal police conduct would be little advanced if witnesses—in addition to defendants—were permitted to invoke the exclusionary rule. The Court also found that no new violation of a witness' constitutional rights under the Fourth Amendment arose upon the grand jury's use of illegally seized evidence, since a witness is normally required to provide to the grand jury all information at his disposal. It might be argued that a witness has a stronger interest in assuring that the grand jury which proposes to question him is properly constituted than in preventing a lawfully constituted grand jury from using evidence illegally obtained by other branches of government. However, while the witness' interest may be greater, the obtrusive effect on grand jury proceedings from the "average" challenge to the grand jury array will doubtless be more substantial than from the average suppression hearing.

Moreover, the social interests to be served by permitting a witness to challenge the grand jury array are already substantially

---

3. Recent cases in other circuits cast some doubt on whether a literal reading of *Blair* is entirely appropriate. See *In re Grand Jury Proceedings* (Schofield I), 486 F.2d 85 (3d Cir. 1973); *In re Grand Jury Proceedings* (Schofield II), 507 F.2d 963 (3d Cir. 1975); *Korman v. United States,* 486 F.2d 926 (7th Cir. 1973); *Matter of the Grand Jury,* 529 F.2d 543 (3d Cir. 1976).

protected by numerous other available parties and remedies. The defendant or Attorney General in any criminal case may challenge the array of the grand jury which brought the indictment, regardless of whether the defendant is a member of the group claimed to have been excluded. Most if not all grand juries return indictments, and so there will usually be one party with a substantial interest in closely examining the grand jury array for compliance with statutory and constitutional requirements. Moreover, civil suits challenging grand jury selection procedures may be brought by persons who are members of the group allegedly excluded. Finally, a witness charged with *criminal* contempt of a federal grand jury is at least arguably within the class of persons authorized by the Federal Jury Selection Act to challenge the grand jury array, in that such a witness may be a litigant entitled to a trial by jury in federal court, see *Muniz v. Hoffman*, 422 U.S. 454, 475–76, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975); *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), and properly regarded as a "criminal defendant" for purposes of § 1867(a). Thus, as in *Calandra*, the added protection to the constitutional requirement of a fairly composed grand jury which would be derived by permitting a witness to bring such a challenge is marginal. There does not appear to be a compelling social need to create new remedies in the hands of grand jury witnesses in order to assure compliance with constitutional requirements.

These considerations suggest that the critical question is the extent to which the witness' interest in appearing before a properly selected grand jury outweighs the undoubted interference with effective grand jury investigations which would ensue from permitting the challenge. In *Chestnut*, the court only considered the witness' interest, and did not focus on the potentially obtrusive effect on grand jury proceedings that might ensue. The Supreme Court's emphasis in *Calandra* and other cases on avoiding disruption of grand jury investigations, as well as certain differences discussed above between federal and state grand juries, suggest that the Court of Appeals for this circuit would decide the present issue against this witness.

At least two circuits have considered the issue since *Chestnut* and have reached a conclusion contrary to *Chestnut*. In *Duncan v. United States*, 456 F.2d 1401 (9th Cir. 1972) the court held that a witness lacked standing to challenge a grand jury array (on grounds that young people were systematically excluded). The Court of Appeals rejected Duncan's claim to standing under the Jury Selection Act, essentially for reasons set forth *ante* at pp. 588–589. With respect to the constitutional claim, the court considered *Chestnut* to be distinguishable since it was the United States Attorney and not the grand jury which sought to hold the witness in contempt. The *Duncan* court went on to quote from *United States v. Blair*, (see pp. 590–591, *ante*) to conclude that the witness lacked standing to challenge the grand jury array, even though the witness had already been held in contempt (and was thus closer to the position of petitioners in *Chestnut* than is the witness here).

In *In re Maury Santiago*, 533 F.2d 727 (1st Cir. 1976) the Court of Appeals also concluded that a witness before the grand jury lacks standing to challenge its composition. Without referring to *Chestnut* at all, the court wrote:

"The policies articulated in *Calandra v. United States*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) concerning the smooth functioning of the grand jury severely limit the issues that may be raised in a § 1826 contempt proceeding. A recalcitrant witness for example, lacks standing to challenge the composition of the grand jury. *United States v. Duncan*, 456 F.2d 1401, 1403 (9th Cir. 1972). Similarly, the witness cannot challenge the authority of the grand jury on the theory that its investigation does not concern matters within the subject matter jurisdiction of the federal courts. *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979, 983 (1919). Therefore, appellant's contentions on

these grounds lack merit." 533 F.2d at 730.

In light of these decisions, we have substantial doubt whether *Chestnut,* albeit the only statement by this circuit, is still controlling. See *In re Cueto and Nemikan, supra,* at 15.[4]

Even if *Chestnut* is still binding in this circuit, however, the issue is not yet ripe for decision. The witness has not even been sworn, nor is he yet in any present danger of contempt. To permit disruption of the grand jury is surely not warranted until and unless the witness is actually placed in jeopardy by virtue of the government's actions. Moreover, as indicated above, if the government should move to hold the witness in *criminal* contempt, there is a basis for arguing that he would then be entitled under the Jury Selection Act, 28 U.S.C. § 1867(a) to challenge the grand jury array.

Accordingly, it is concluded that Mr. Archuleta presently lacks standing to challenge the array of the grand jury.

## II.

■ Although Archuleta advances numerous other arguments in support of his motion to quash, all essentially go either to the government's good faith in calling him before the New York grand jury or to the burdensome or unconstitutional effect which would result from requiring his compliance with the subpoena. It is important to consider at the outset the scope and legitimacy of this grand jury investigation.

Between October 26, 1974 and April 9, 1977 there have been nine separate bombing incidents in this district, "credit" for which has been claimed by, or attributed to, the F.A.L.N. There is no question that these events warrant the attention of the United States Attorney's office for this district and of a grand jury. Indeed, each has an obligation to investigate these serious criminal acts, some of which resulted in the loss of human life. Moreover, the possibility that these acts occurred pursuant to a broader conspiracy justifies a grand jury in this district in investigating acts occurring in other districts insofar as they relate to conspiracy or substantive offense committed here or a conspiracy to commit a substantive offense here. It is thus appropriate and legitimate for grand juries in New York and Chicago to conduct simultaneous and overlapping investigations of F.A.L.N. bombings occurring in their respective districts and to call witnesses in pursuit of these investigations.[5]

## A.

■ Archuleta has not been sworn as a witness nor asked any specific questions by the grand jury in this district. Since he has not, there is no claim that the questions asked or information sought tread upon interests protected by the First Amendment. Cf. *Bursey v. United States,* 466 F.2d 1059, 1086 (9th Cir. 1972). Rather, Archuleta claims he has been 'targeted' for appearance before the grand jury by virtue of constitutionally protected activities and that the subpoena itself must accordingly be quashed. A court will refuse to enforce a subpoena if the grand jury is not pursuing a good faith investigation or is motivated by a desire to harass. *United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 35 L.Ed.2d 67 (1972); *Branzburg v. Hayes,* 408 U.S. 665, 707–08, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). However, where a witness refuses even to appear for questioning before the grand jury, a concrete basis for determining whether First Amendment interests are implicated is often lacking. The threshold showing which must be made to

---

4. The Court of Appeals there wrote,
 "It is a fundamental rule of law that the public has a right to every person's evidence. There are a small number of constitutional, common-law and statutory exceptions to the general rule, but they have been neither 'lightly created nor expansively construed, for they are in derogation of the search for truth.' *United States v. Nixon,* 418 U.S. 683, 710 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1974)."

5. It appears that the New York grand jury is investigating not only the bombings occurring in New York but also bombings occurring in other parts of the country believed to be related to the New York bombings. See "open" Affidavit of Thomas Engel, ¶¶ 4, 5.

require a hearing on a motion to quash a subpoena on First Amendment grounds must be substantial, since the grand jury is normally entitled to put its questions to a witness. As Judge Friendly has written in *United States v. Doe*, 457 F.2d 895, 899 (2d Cir. 1972),

> "[While] on occasion a grand jury may overstep bounds of propriety [and] . . . conduct an investigation so sweeping in scope and undiscriminating in character as to offend other basic constitutional precepts . . . [a]part from such cases, when the grand jury has engaged in neither a seizure nor a search there is no justification for a court's imposing even so apparently modest requirement as a showing of 'reasonableness'—with the delay in the functioning of the grand jury which that would inevitably entail."

■ Archuleta has failed to make such a threshold showing of impropriety in his claim that the subpoena is in retaliation for his political activities in New Mexico which he alleges to be in opposition to the local powers that be. He does not specify a causal connection between those activities and whatever local ire they may have provoked and the issuance of a subpoena by a federal grand jury in the Southern District of New York. Although affidavits from Archuleta and other persons with whom he works and associates in New Mexico establish a good faith basis for their belief that local officials are harassing them unlawfully for political reasons, even if such a pattern existed in New Mexico, it would not affect the legitimacy of this grand jury's need for his testimony. Neither these affidavits nor the "offer of proof" that Archuleta is a victim of a national "COINTELPRO" operation requires a hearing in light of the government's open affidavits [6] and findings of the legitimacy of this grand jury investigation by us and by other courts.

The open affidavit states that one significant basis for issuing the subpoena to Archuleta is his past membership in the National Hispanic Commission. Archuleta argues that this is an improper basis for issuance of a grand jury subpoena.

In considering a related claim raised by two other witnesses subpoenaed by the same grand jury, Judge Pierce held that where a person's associational activities form the basis for issuance of a subpoena, the government must show a "meaningful relationship" between the association and the legitimate inquiries of the grand jury in order to protect the proposed witness from the possible chill of his First Amendment rights. *In re Grand Jury Subpoena of Wood et al.*, 430 F.Supp. 41 (S.D.N.Y.1977). Judge Pierce found that the instant grand jury was conducting a careful, proper and limited inquiry into the bombings and that the government had demonstrated the requisite meaningful relationship between the Hispanic Commission and the subject matter of the grand jury investigation.

The open affidavit submitted by the government on this motion leads us to concur with Judge Pierce's findings. One member or former member of the Hispanic Commission, Carlos Torres, has been charged with serious criminal activity in connection with the bombings and is a fugitive. According to the government's brief submitted on the appeal from Judge Frankel's order, material from the National Hispanic Commission was found in the "bomb factory" in Chicago believed to be Torres' apartment. Members of the Commission may reasonably be thought to have knowledge—which may, of course, be perfectly innocent—as to another member's whereabouts and his criminal activity.

■ In calling a witness to testify, a grand jury makes no accusation which must be supported by probable cause; nor does it

---

6. In his supplemental affidavit filed April 26, 1977, Assistant United States Attorney Engel represented that

> "the grand jury investigation in this case in no way concerns the so-called COINTELPRO activities, or the asserted purposes of those

activities, complained of in the unsworn statements in the Offer of Proof. The investigation has a very simple and limited purpose: to identify the individuals responsible for the New York bombings for which the FALN has claimed credit."

subject the witness to public obloquy particularly since grand jury proceedings are conducted in secret. Cf. *N. A. A. C. P. v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The First Amendment does not stand as a bar to the grand jury's calling members of an organization one of whose members has been charged with serious criminal activity to determine whether their association with him has produced any knowledge relevant to the investigation of criminal conduct.[7] No intent to harass in violation of the First Amendment can be inferred from such a procedure, since it is not the nature of the organization's purpose or interest which prompts the inquiry, but merely the possibility that persons who associate with each other may have knowledge about one another, which is relevant to the inquiry. We conclude therefore that no evidentiary hearing on this claim is required.

### B.

■ Nor is a hearing required on the claim that the grand jury is improperly searching for fugitives on behalf of the executive branch. We assume as true the facts set forth in the Movant's affidavit, namely, that on Archuleta's refusing to talk with F.B.I. agents investigating F.A.L.N. activities in New Mexico, the agents "threatened" him with being brought before the grand jury. However, as indicated above, being called to testify before the grand jury is neither a punishment nor a disgrace; and appearance is a duty, of course frequently an inconvenient one, which citizens must perform.

■ A grand jury may use its subpoena power to call witnesses to aid in finding other witnesses whose whereabouts are unknown and whom the grand jury believes it should hear. As Judge Pierce held, in response to a witness' claim that "the use of the grand jury to seek to locate possible fugitives from justice constitutes an abuse of the grand jury power:" "the grand jury may properly be employed to locate other prospective witnesses, even when those persons may be fugitives from justice." *In re Wood Subpoena, supra,* at 47, 48. We recognize, as did Judge Pierce, that there may be circumstances in which the power may be abused, for example, where a grand jury subpoena is issued for the purpose of permitting a prosecutor or government agent to have conversations with a witness without the protection of the grand jury's secrecy and independence, *Durbin v. United States,* 221 F.2d 520, 524 (D.C.Cir. 1954), or where the subpoena is issued solely for purposes of discovering the whereabouts of a fugitive in whose testimony the grand jury itself has no interest. If the facts alleged supported the claim that either of these situations existed, a hearing would be appropriate. However, it cannot reasonably be claimed that this grand jury has no interest in calling Torres as a witness and accordingly, in discovering his whereabouts.

### C.

■ Archuleta claims for various reasons, that execution of the New York subpoena should be barred—either permanently or temporarily—because of the ongoing grand jury proceedings in Chicago. Although a wise national policy might caution against calling witnesses across the country to different grand juries investigating similar or related acts at the same time, a court cannot create such policies by judicial fiat but may only consider whether Archuleta's rights are invaded or the grand jury process abused. On a careful consideration of the arguments presented, we conclude that the

7. The "chill" on First Amendment rights described in affidavits submitted by Constancia Valdez and Henrietta Esquibel is not one from which the law provides protection. Affiants state that they have been discouraged from attending political meetings in New Mexico because of a fear that they will be called to New York to testify. Since the New York investigation is proper, and since citizens owe a duty to respond to a proper subpoena, however, the risk that by participating in political activities one will acquire knowledge of criminal behavior which knowledge the government may attempt to obtain in grand jury proceedings is one that must be borne, at least absent a showing of some connection between mere attendance at the New Mexico meetings and Archuleta's summons to New York.

subpoena was properly issued by the New York grand jury and that the pendency of the Chicago proceedings does not require the government to make a special showing of need in support of the New York subpoena beyond the showing it would ordinarily be required to make to justify its subpoena. This it has done.

Archuleta's claims that the New York subpoena is designed to "circumvent" the Chicago proceedings, prevent him from litigating his claims in Chicago, and represents impermissible "forum shopping" by the government are not persuasive. Once it has been determined that the New York grand jury is entitled for its own legitimate purposes to call Archuleta, it cannot be said that the Chicago grand jury or court has been "circumvented" by the New York subpoena, even if Archuleta "wins" in Chicago. Nor has movant established that the New York subpoena will 'prevent' litigation of his rights in Chicago. He has been ably served in these proceedings by a battery of counsel from across the country. Government counsel advises us that Archuleta's expenses of flying to New York for purposes of this proceeding are paid for by the government.[8] The litigation here does not require Archuleta's continual presence, and there is thus no basis for concluding that these proceedings will interfere with his ability to protect his rights in Chicago.

Two additional arguments are made: that the New York subpoena is burdensome and oppressive because the grand juries in both New York and Chicago are investigating essentially the same set of incidents and are seeking identical information from the witness; and that since Archuleta has "publicly announced" his refusal to testify in Chicago calling him to New York is an impermissible attempt to punish him.

■ Assuming for purposes of the motion that both grand juries seek Archuleta's appearance for similar, if not identical purposes, the question is whether two federal grand juries in different districts may issue closely successive subpoenas to a single witness for purposes of obtaining similar information relevant to separate investigations which are legitimate in each district. The answer to the question is affirmative. Cf. *In re Pilliteri*, 420 F.Supp. 913 (W.D.Pa. 1976). While in ordinary civil litigation it is the rule that "the federal court first seized of an action should be the one to adjudicate it," *Commerce & Indus. Ins. Co. v. Cablewave, Ltd.*, 412 F.Supp. 204, 207 (S.D.N.Y. 1976), grand juries perform distinctive functions. Applying the "first-forum" rule to grand jury proceedings could seriously impair their ability speedily to investigate criminal activity occurring within their districts. Even more important, is the proposition that while the two grand juries may be seeking similar information from the witness, the issues being litigated in Chicago are not identical to those raised here; disposition of the challenge to the Chicago grand jury or to illegal wiretapping there would have no dispositive effect on similar claims raised in the separate factual context of this district.

■ While it is of course true that it is the responsibility of courts to supervise grand juries to prevent abuse of their powers, *In re Grand Jury Proceedings*, 486 F.2d 85 (3d Cir. 1973), Archuleta has not made a showing of abuse. *In re National Window Glass Workers*, 287 F. 219 (N.D.Ohio, 1922), on which Archuleta relies, is inapposite. The major purpose of the second grand jury there was to gather evidence in support of an existing indictment in another federal district in which trial was imminent; no trial in the second district was contemplated unless the first indictment was dismissed; and the same Assistant United States Attorney was handling both investigations. It is manifestly improper to utilize a grand jury to procure evidence to be used in support of a previously existing indictment. *United States v. Dardi*, 330 F.2d 316

---

8. Archuleta and his wife, by affidavits, state that compliance with the New York subpoena will prevent Archuleta from, *inter alia*, performing important duties as an ambulance driver in New Mexico, and properly caring for his family and their home. We cannot understand how appearing to testify for a few days could have so disruptive an effect.

(2d Cir. 1964); *United States v. Fisher*, 455 F.2d 1101, 1104–05 (2d Cir. 1972). Here, however, no indictment against Archuleta has been procured in either district; each grand jury has a legitimate interest in investigating substantive offenses occurring within the district, see *In re Grand Jury Investigation (G. M. Corp.)*, 32 F.R.D. 175 (S.D.N.Y.1963); and the subpoena has not been served on a defendant short weeks before his criminal trial.

We do not denigrate the practical inconvenience to Archuleta of having to respond to the New York subpoena. New York and Chicago are each a long way from the witness' home and from each other. The subpoena is certainly "burdensome" in the ordinary sense of the word, as are many subpoenas. But the grand jury is entitled to inconvenience citizens where necessary, as here, for purposes of acquiring information relevant to its legitimate inquiries.[9] The only burden to which the witness has pointed is that of coming to New York from New Mexico to testify for a day or two. This is a reasonable burden and one which any witness must bear.

This is not to suggest that under no circumstances may a subpoena be quashed on grounds of burdensomeness arising out of subpoenas, issued by various federal grand juries investigating related criminal activity. At some point such successive or contemporaneous subpoenas might well become abusive in their cumulative impact; but that point has not arrived in this litigation.

■ With respect to the witness' final contention, the law does not require the grand jury to accept a witness' "public announcement" that he will not testify. See *United States v. Messitte*, 324 F.Supp. 334 (S.D.N.Y.1971). A grand jury with a legitimate interest in hearing from a particular witness may call him, and put him to the test of whether he will testify, assert his rights under the Fifth Amendment, if it applies, or refuse to testify. It is not unreasonable to act on the proposition that persons faced with the actuality of the choice, and possible concomitant penalties may decide to testify. Archuleta has not been held in contempt or sanctioned in Chicago, and accordingly we need not address the question that might be presented if he had already been held in contempt.[10] Cf. *In re Certain Proceedings Before the 1959 Grand Jury*, 212 F.Supp. 823 (N.D.Ill.1963); *In re Pilliteri*, 420 F.Supp. 913 (W.D.Pa. 1976). No basis exists for barring this grand jury from attempting to obtain Archuleta's testimony as the case now stands.

### III.

■ Archuleta raises two final points concerning the government's conduct—and misconduct—in the course of the investigation which warrant some judicial response. On Sunday, April 17, 1977, the New York Times published a front page story on the federal investigation of the F.A.L.N. bombings based in part on information attributed to confidential law enforcement sources. Although much of the information in the article had at the time become a matter of public record, among the previously non-public items revealed was the report that Archuleta had allegedly been named in a "confidential law enforcement memo" as a "prime suspect" in the theft of dynamite from Heron Dam in New Mexico which was believed to have turned up in F.A.L.N. bombs that failed to explode, and an inaccurate report that Archuleta had been asked to provide voice samples to the Chicago grand jury for comparison with tapes of voices making phone calls to announce that bombs had been planted.[11]

9. Indeed, the subpoena itself commands that the witness lay aside "all and singular business and excuses."

10. Should Archuleta at some point be held in contempt in Chicago one might reasonably question the government's purpose in subpoenaing him to New York to testify on the same subjects. In such an event it might be appropriate to consider any penalty imposed in Chicago in connection with the imposition of any penalty for an identical refusal to testify in New York.

11. In fact, Archuleta's counsel advised the court that he was asked for fingerprints and photographs of himself, but was not asked for voice exemplars.

Release of such information is obviously injurious to Archuleta's reputation and standing in the community. Affidavits have been submitted to support his claim that the medical and community centers for which he works will suffer loss of funds and volunteer time as a result of these disclosures. The possibility that federal law enforcement officials were responsible for the "leak" is a matter of grave concern, since such disclosures might be a betrayal of the grand jury's historic role as a shield for innocent citizens from unwarranted charges of wrongdoing. See *In re Biaggi*, 478 F.2d 489, 491–92 (2d Cir. 1973); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).

The principle of grand jury secrecy is reflected in Rule 6(e) of the Federal Rules of Criminal Procedure, which provides that:

"Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise, a juror, attorney, interpreter, stenographer, operator of a recording device or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of a defendant [on a motion to dismiss the indictment]."

The Court of Appeals of this Circuit has held that the disclosure permitted to United States Attorneys "refers to their need for the minutes in the preparation of criminal, or sometimes, civil cases; it does not confer a license to broadcast a transcript of grand jury proceedings to the world . . ." *In re Biaggi, supra*, at 491–92.[12]

Moreover, the Department of Justice has promulgated regulations prohibiting certain disclosures of evidence in pending criminal investigations, regardless of whether the information has been presented to a grand jury. The guidelines apply to all Justice Department personnel, and would therefore include not only members of the United States Attorney's office but also members of the F.B.I. Since Archuleta has been named as a "suspect" in the Chicago grand jury investigation, the Justice Department guidelines by their terms apply to his case. 28 C.F.R. § 50.2(b). The guidelines specifically provide that:

"(6) The release of certain types of information generally tends to create dangers of prejudice without serving a significant law enforcement function. Therefore, personnel of the Department should refrain from making available the following:

(i) Observations about a defendant's character.

(ii) Statements, admissions, confessions, or alibis attributable to a defendant, or the refusal or failure of the accused to make a statement.

(iii) Reference to investigative procedures such as fingerprints, polygraph examinations, ballistic tests, or laboratory tests, or to the refusal by the defendant to submit to such tests or examinations.

(iv) Statements concerning the identity, testimony, or credibility of prospective witnesses.

(v) Statements concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial.

(vi) Any opinion as to the accused's guilt, or the possibility of a plea of guilty

---

12. In supplemental papers of May 13, 1977 Archuleta argues that the government, by filing with the court three pages of the grand jury minutes in Chicago (in which Archuleta was warned by the Assistant United States Attorney that he was a "suspect" in their investigation, that he had a right not to incriminate himself and to consult his attorney outside the grand jury room at any time), made an improper disclosure forbidden by Rule 6(e) which warrants, either in itself or in conjunction with other events, quashing the subpoena. Although the government should have applied for permission from the District Court in Chicago prior to submitting the testimony in this proceeding, the testimony was submitted on a point raised by Archuleta himself concerning what he had been told in the Chicago grand jury, and therefore he was not damaged by the submission.

to the offense charged, or the possibility of a plea to a lesser offense." 28 C.F.R. § 50.2(b)(6).

The information concerning Archuleta disclosed in the New York Times article is within the prohibitions of subparagraphs (ii), (iii) and (v), *supra.*

Shameful as is the publication of such material, however, we cannot agree that the appropriate remedy on the present facts is to quash the subpoena. There is no evidence that the New York investigation was the source of the story. The United States Attorney's office for the Southern District of New York has represented that

> "no matter occurring before the grand jury and no information obtained in the grand jury investigation in New York was disclosed by anyone working in connection with the grand jury's office, either at the United States Attorney's office or at the Federal Bureau of Investigation." (Supplemental Affidavit of Thomas E. Engel, filed April 26, 1977)

To prevent the grand jury from acquiring knowledge from this witness relevant to its legitimate investigation into serious crimes because some law enforcement officer somewhere in the country may have committed a breach of law or ethics would neither retrieve the injury to Archuleta's reputation nor sanction the appropriate governmental employee or unit. Cf. *United States v. Capra,* 372 F.Supp. 609 (S.D.N.Y. 1974). The remedy for improper disclosure of grand jury evidence is to punish the offending party in a contempt proceeding. *United States v. Schiavo,* 375 F.Supp. 475 (E.D.Pa.1974); *United States v. Smyth,* 104 F.Supp. 283, 293 (N.D.Cal.1952).

The breach of law which may have occurred is sufficiently grave, however, that it would be insufficient for the court to rest on mere exhortations and condemnatory words: "the mere gnashing of judicial teeth should not remain the sole response to such law enforcement behavior." *United States v. Capra, supra,* 372 F.Supp. at 615. The government is, perhaps understandably, unable to represent that no federal law enforcement official or grand juror in the country was responsible for the leakage. At oral argument, Assistant United States Attorney Engel conceded that "the government is not in a position to deny that some of that information may have come from federal sources somewhere in the United States." (Tr. at 26)

Breaches of grand jury secrecy have been occurring with disturbing frequency; Attorney General Bell has recently ordered an internal investigation into the source of a news story concerning secret deliberations of another federal grand jury in the Southern District of New York. See "Carter Defends Continuing Investigation and Possible Prosecution of F.B.I. Agents," *New York Times,* Fri., May 13, 1977, at A 13. Until an investigation is conducted into the sources of this publication, sanctions cannot be imposed. A national level inquiry is required since grand juries and federal law enforcement personnel in more than one federal district are investigating the F.A.L.N. bombings. Accordingly, we request the Attorney General to conduct an internal investigation of whether there was a federal source for the disclosure and if so, who it was. The United States Attorney for the Southern District of New York, over whom this court has jurisdiction, is directed to conduct an investigation into any federal sources of improper disclosure concerning the F.A.L.N. investigation in the Southern District of New York and to report to the court within thirty days on the progress of this investigation. *In re Biaggi, supra,* 478 F.2d 489, 490 n. 1.

 Archuleta's final claim is that if he should assert his Fifth Amendment privilege and is granted use immunity, such immunity will insufficiently protect him from possible impermissible use of his immunized testimony by the United States Attorney's office for the Northern District of Illinois, where he is already for all practical purposes a target of the grand jury. The short answer to this contention is that it is premature: Archuleta has not yet been sworn, and thus has not yet been asked any

questions. He may find that he is not asked to answer any incriminating questions; he may assert his Fifth Amendment privilege, and the government may decide not to seek to compel his testimony through the grant of use immunity.

Moreover, should Archuleta testify under a grant of use immunity, his rights can be adequately protected by the requirement in any subsequent prosecution that the government demonstrate that no part of its case was derived, directly or indirectly, from the immunized testimony and that it has a wholly independent source for its case. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Despite the availability of these protections, however, should Archuleta testify, the United States Attorney's office for this District would be well advised not to share his testimony, directly or indirectly, with any other prosecutor's office, in order to insure that the immunized testimony is not used "in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973). See *United States v. Hinton*, 543 F.2d 1002 (2d Cir. 1976).

For the reasons stated Archuleta's motion to quash the subpoena on the grounds discussed above is denied. The United States Attorney is ordered to report to the court within thirty days or such additional time as the court may then allow, on good cause shown, as to the source of leakage of confidential information to the New York Times in violation of Justice Department guidelines.

### IV.

■ The motions to intervene, described above at pp. 586–587, are denied. None of the parties seeking to intervene, with the possible exception of Archuleta's immediate employers, are arguably entitled to intervene as of right under Rule 24 of the Federal Rules of Civil Procedure (assuming the rule to be applicable at all to grand jury proceedings); and we conclude that the relationship between the interests asserted here by Archuleta and those of his employers, while not inconsequential, are not so direct and immediate as to require their being permitted to intervene. *Comp. Application of Caldwell*, 311 F.Supp. 358 (N.D.Cal.), *rev'd on other grounds*, 434 F.2d 1081 (9th Cir. 1970), *rev'd sub nom. Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *United States v. Doe*, 332 F.Supp. 930 (D.Mass.1971), *aff'd.* 455 F.2d 753 (1st Cir.), *vacated and remanded on other grounds sub nom., Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

The remaining proposed intervenors essentially claim a professional or personal interest generally in seeing grand jury abuses curbed, and allege a "chilling" effect on their First Amendment rights if this subpoena is enforced. These interests are not sufficiently concrete to warrant permissive intervention, in light of (a) the highly competent and vigorous representation of those interests already being provided by counsel for the witness, and (b) the disruptive potential which permitting intervention would have on the orderly resolution of the proceedings.

All motions are denied in accordance with this opinion. This opinion does not deal with Archuleta's motion to quash the subpoena on grounds of illegal wiretapping.

It is so ordered.