In re GRAND JURY INVESTIGATION.

T. Bertram LANCE, Petitioner-Appellant,

v.

The UNITED STATES DEPARTMENT OF JUSTICE and the United States Attorney's Office for the Northern District of Georgia, Respondents-Appellees.

No. 79–1978.

United States Court of Appeals, Fifth Circuit.

Jan. 8, 1980.

---

Powell, Goldstein, Frazer & Murphy, Gary G. Grindler, Nickolas P. Chilivis, Atlanta, Ga., for petitioner-appellant.

Louis M. Fischer, Appellate Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for respondents-appellees.

Before THORNBERRY, CHARLES CLARK and KRAVITCH, Circuit Judges.

CHARLES CLARK, Circuit Judge:

T. Bertram Lance appeals from an order of the district court denying his motion for sanctions in which he alleged that Justice Department attorneys and grand jurors had violated F.R.Crim.P. 6(e) by disclosing information about matters occurring before a federal grand jury. The district court ruled that Lance's initial showing failed to establish a prima facie a violation of Rule 6(e) and dismissed the motion without holding an evidentiary hearing. Because the evidence of newspaper articles and television reports, which discussed the actions of the grand jury and the scope of its inquiry and which attributed the information to Justice Department sources, made a sufficient prima facie showing of a violation of Rule 6(e) to require an evidentiary hearing on his motion, we reverse and remand.

### I. Factual Setting

In late 1977, a federal grand jury in the Northern District of Georgia began examining various practices engaged in by the banking community of northern Georgia. The Justice Department's decision to initiate the grand jury inquiry resulted from investigations by the Justice Department, other government agencies, and Congressional committees into the activities of Lance, a former Director of the Budget and confidant of the President, while he was associated with the National Bank of Georgia. The grand jury did not limit its investigation to Lance's activities; yet he was clearly the primary focus of its proceedings.

The progress of the grand jury investigation was closely followed by the news media, and in November, 1978, Lance filed a motion requesting the district court to prohibit all extrajudicial publicity by the attorneys participating in the grand jury inquiry; to require all motions, briefs, appeals, orders, and other papers involved in the grand jury proceedings to be filed *in camera* and under seal; and to instruct the grand jurors to disregard any news media accounts of the investigation. Lance asserted that the extensive publicity surrounding the grand jury's investigation had exposed him to ridicule, humiliation, and embarrassment and had detrimentally affected the impartiality of the grand jury. As examples of the prejudicial publicity which he sought to have prohibited, Lance presented seven newspaper articles, which are described in the margin.[1]

In response to Lance's motion seeking to end this publicity, the district court con-

---

1. The first article had been printed in the *Atlanta Journal and Constitution* on November 24, 1977. It reported that the Justice Department had approved the initiation of a grand jury probe into Lance's financial activities and that the grand jury's first action would be to issue subpoenas to two banks with which Lance had been associated, the National Bank of Georgia and the First National Bank of Calhoun, Georgia. Stating that other federal agencies would continue to investigate different aspects of Lance's banking activities, the article discussed

ducted a hearing in chambers on November 29, 1978. At this hearing, the district judge disclosed that at a social gathering several people had informed him that two grand jury members were repeating the testimony

of a grand jury witness. The court granted Lance's request, which was not opposed by the Justice Department, that all papers concerning the grand jury investigation be filed *in camera* and under seal. The court

an investigation conducted by the Securities and Exchange Commission (SEC) and a meeting which occurred between lawyers representing Lance and attorneys from the SEC's enforcement division. The sources of the information disclosed were described as "official sources," a "departmental spokesman," "sources," and an article appearing in the *Washington Post.*

On January 21, 1978, the *Atlanta Journal and Constitution* published the second article. It indicated that "sources familiar with the investigation" had disclosed that the grand jury would hear testimony in the following week about Lance's relationship with a New York bank from which he had obtained a large personal loan and with which the National Bank of Georgia had deposited funds subsequent to the loan. The article discussed questions which Justice Department attorneys were expected to ask bank officials and stated that according to "sources," the bank officers were the first of a series of witnesses who would be called before the grand jury and whose testimony might not be completed for six months.

The third article appeared in the *New York Times* on April 28, 1978. Attributing the information to "a source familiar with the proceedings," it revealed that the grand jury was focusing primarily upon improprieties in loans Lance obtained from a group of small banks in northwest Georgia and in loans which officers of other Georgia banks were able to obtain from Lance's bank. A "person close to Mr. Lance" had informed the reporter that the grand jury had subpoenaed several officers of banks in northern Georgia to testify about their dealings with Lance, and "a Justice Department source familiar with the investigation" had stated that Lance was more likely to be criminally liable for his dealings with the small banks in Georgia than for his more widely publicized activities · involving New York and Chicago banks.

The *Washington Post* published the fourth article on September 21, 1978. It stated that the grand jury would soon decide whether to return an indictment against Lance, and reported that "a target of the investigation as well as other sources" had disclosed that the grand jury's investigation had paralleled the allegations of wrongdoing by Lance made in a civil suit filed by the SEC against Lance, the First National Bank of Calhoun, and the National Bank of Georgia. Garnering its information from "several sources," the article enumerated the criminal acts with which Lance could potentially be charged, revealed the contents of

documents presented to the grand jury, and listed the particular banks whose practices the grand jury was examining.

On October 21, 1978, the fifth article appeared on the front page of the *Los Angeles Times.* Citing "sources close to the case," the article stated that the grand jury had expanded its inquiry to Lance's business dealings in 1977 after he had resigned his position with the Georgia banks and had begun serving as Budget Director for President Carter. The grand jury was now investigating Lance's role in a sale of securities and in obtaining loans and credit for his relatives from Georgia banks. The article disclosed that "a senior Justice Department official" had indicated that the investigation of Lance's activities was expanding and that a decision concerning whether an indictment would be sought would not be made until after early November. According to the article, "an informed source" had revealed that the grand jury had previously been concentrating on the possibility that Lance had misapplied banking funds prior to becoming Budget Director, and it had used a computer to analyze the effects on the First National Bank of Calhoun of overdrafts by Lance and his relatives. A "source familiar with the inquiry" was quoted as stating that the overdrafts were being traced to their end. The article described a particular sale of securities which the grand jury was examining, and disclosed that "sources familiar with the grand jury inquiry" considered it unlikely that a tax action would be initiated against Lance as a result of his use of a bank airplane for private travel.

The sixth article appeared in the *Atlanta Journal and Constitution* on October 22, 1978. It primarily summarized the contents of the article which had been printed the previous day in the *Los Angeles Times,* adding only that the report that the grand jury was investigating Lance's activities after he became Budget Director in 1977 was not surprising to "sources familiar with the investigation" since those activities were involved in the SEC suit which had motivated the grand jury inquiry.

Printed in the *Wall Street Journal* on October 23, 1978, the seventh article reported that a "justice department official" had stated that the grand jury's probe was almost complete. The official confirmed reports that the grand jury had investigated Lance's activities while he was Budget Director, but indicated that this did not constitute a broadening of the scope of the inquiry.

also ordered the Justice Department attorneys to admonish the members of the grand jury, on a daily basis if necessary, not to disclose any information concerning their proceedings and suggested that the attorneys also instruct the grand jurors that they should consider only the evidence presented before them in determining whether sufficient probable cause existed for the return of an indictment. The court then requested the Justice Department attorneys to report to it the reaction of the grand jurors to the admonitions. The court also ordered the attorneys to inform Justice Department officials in Washington that it wished the disclosures to cease and would take further steps to enforce the dictates of Rule 6(e) if necessary. The attorneys were to report to the court in fifteen days: to whom they spoke in the Justice Department, the substance of their communication to the Washington officials, and the response of those officials. The court did not rule upon Lance's request that it order the grand jurors not to read any newspaper articles or listen to any news media reports about the investigation, believing that it did not have the authority to enter such an order.

This first effort to curtail the publicity surrounding the grand jury's investigation met with limited success. Following the publication of additional news articles revealing that Lance had declined to testify before the grand jury and describing Lance's efforts to prohibit the disclosure by the Justice Department of information about the grand jury proceedings, Lance's attorney on January 4, 1979, sent to the district court for *in camera* consideration a letter expressing his client's concern about the continued disclosure of grand jury information and requesting that an *in camera* conference with the Justice Department attorneys be held to discuss the resolution of the publicity problem. Together with the letter, Lance's attorney enclosed an unfiled motion. In the motion, Lance made three requests. The first asked that the court order all government attorneys associated with the grand jury to show cause why the court should not sanction them for disclosing (i) Lance's decision not to testify before the grand jury and (ii) the occurrence and results of the prior *in camera* hearing of November 9, 1978. The second asked that the court examine each of the grand jurors *in camera* to determine whether any grand juror had violated the secrecy requirements of Rule 6(e) and should be sanctioned. Finally, he asked the district court (i) to admonish the grand jurors about their duty to determine probable cause on an impartial basis and to maintain the secrecy of their proceedings, (ii) to instruct the grand jury not to read newspaper articles or listen to other media accounts about the investigation, and (iii) to require that all the remaining proceedings before the grand jury be fully transcribed. In addition to describing Lance's earlier efforts to have the disclosures of information about the grand jury proceedings halted, his motion cited four articles which had appeared in numerous newspapers and, in substance, had been reported on radio and television. The articles allegedly revealed information about the grand jury proceedings and described Lance's prior efforts to halt the leak of such information, including the nature of the *in camera* proceeding before the district court in November, 1978. They are noted below.[2]

2. The first article was published in the *Washington Post* on December 8, 1978, and appeared in several other newspapers on the same date, including the *Atlanta Constitution*. Without attributing the information to a specific source, the article indicated that Lance had declined to accept an invitation by the Justice Department to testify before the grand jury investigating his financial affairs. Relying upon "legal authorities and the [Justice] department's regulations on grand jury practice," the article stated that such invitations to testify generally are extend-ed to the targets of investigations which are in the final stages and are expected to result in indictments. The article reported that "knowledgeable sources" had revealed that Lance received the invitation to testify in a letter mailed in late October or early November. Without attributing a source, the article indicated that the grand jury was not likely to attempt to compel Lance to testify, that the grand jury inquiry was following the outline of the civil complaint which the SEC and the Comptroller of the Currency had filed against Lance in

In response to Lance's letter, the parties met for a second *in camera* hearing before the district court on January 22, 1979. As an initial matter, the court dismissed as moot the motion filed by Lance seeking to require that the grand jury proceedings be recorded after being assured by the government attorneys that the proceedings were being recorded and that they were attempting in good faith to make all their statements on the record. With regard to Lance's charges that further disclosures of grand jury material had occurred, the district court stated that it did not consider the reports about Lance's decision not to appear before the grand jury to violate Rule 6(e). The court did, however, regard Attorney General Bell's statements about the prior hearing as a violation of the court's order that the proceedings be held *in camera*. The Justice Department attorneys stated that they had not released any information about the grand jury proceedings to anyone who was not involved in the investigation. The court reiterated its intent to enforce the provisions of Rule 6(e) and suggested that the Justice Department attorneys again inform their superiors that they should maintain the confidentiality of the material presented to the grand jury and should not disclose any information about the two *in camera* proceedings.

These last efforts by Lance to halt the publicity surrounding the grand jury inquiry were successful until late March, 1979, at which time interest in the grand jury probe was again spurred by the appointment by the Attorney General of a "special counsel" to direct the investigation of loans made by the National Bank of Georgia, while Lance was its president, to the peanut warehouse business operated by President Carter's family. Following the appearance of a series of articles announcing the appointment of the special counsel and reporting that the Justice Department would seek an indictment of Lance shortly,

April, and that the grand jurors were attempting to determine whether Lance had knowingly misapplied bank funds and whether he had made false statements on applications for loans for his relatives.

Also printed on December 8, 1978, the second article appeared in the *Atlanta Constitution* and was the basis of another article published by the *Washington Star* on the same day. This article reported that Lance had rejected an invitation to testify before the grand jury, which "two sources familiar with the investigation" had disclosed was issued in late October. The article indicated that Lance had declined to appear before the grand jury on the advice of his attorney. Citing "several sources," the article reported that the grand jury was expected to reconvene the following week, at which time the presentation of a review of former testimony would be completed. The article indicated that the grand jury had been reviewing for several months the testimony presented by witnesses to various federal agencies and ascribed the length of the investigation to its apparent expansion by the government to encompass loans made in 1975 and 1976 to business ventures operated by President Carter's family by the National Bank of Georgia, of which Lance was president. The article in the *Washington Star* primarily repeated the contents of the article in the *Atlanta Constitution*, adding only a short description of the origins of Lance's difficulties in loans he made to purchase a controlling interest in the National Bank of Georgia and of a 1977 report by the Comptroller of the Currency questioning Lance's banking practices.

On December 9, 1978, the *New York Times* published the third article. For the most part, it repeated the information revealed in the two articles which had appeared on the previous day in the *Washington Post* and the *Atlanta Constitution*. It discussed the significance of Lance's refusal to testify before the grand jury and depicted the current status of the grand jury inquiry. The article, however, did report that "sources close to the investigation in Atlanta" had stated that any indictment which might result from the investigation would, most likely, not be returned until the following year.

The fourth article was a reprint in the *Atlanta Journal and Constitution* on December 17, 1978, of an article first appearing in the *Los Angeles Times*. It reported comments made by Attorney General Griffin Bell on a variety of subjects, including the grand jury investigation of Lance's banking activities. Attorney General Bell was said to have revealed that Justice Department officials had been ordered by the district court to restrict their statements about the grand jury probe to a simple acknowledgement of its existence, following an unsuccessful attempt by Lance's attorneys to obtain a "gag order" against the Justice Department at a "closed-door" hearing before the court. The article indicated that the district court had specifically cautioned Justice Department officials not to make any statements about the direction taken by the grand jury probe or Lance's possible culpability.

Lance filed the motion for sanctions which is the basis of this appeal.

In his motion for sanctions, Lance alleged that the disclosures contained in the numerous news media reports about the grand jury investigation violated Rule 6(e) and sought three forms of relief: first, that all persons associated with the Department of Justice or the United States Attorney's Office for the Northern District of Georgia who had any involvement with the grand jury probe be ordered to show cause why contempt sanctions should not be imposed for the disclosures by the Justice Department of confidential grand jury matters; second, that the court examine each member of the grand jury *in camera* to ascertain whether any juror had violated the obligation of secrecy imposed by Rule 6(e); third, that the court impose any sanctions which might be warranted, including an order dismissing the grand jury and barring the Justice Department from prosecuting him as a result of this investigation. In support of this request for relief, Lance presented to the court four new newspaper articles.[3]

3. Published in the *Atlanta Journal* on December 29, 1978, the first article reiterated for the most part information contained in the earlier articles about Lance's attempts to stop the publicity about the grand jury investigation and about the restrictions placed upon the Justice Department attorneys by the district court. Garnering its information from "sources," the article reported that Lance's attorney had twice attempted to halt the publicity about the grand jury probe. Discussing the limits on disclosures instituted by the district court, the article stated that "a source familiar with the Lance side of the case" had revealed that the district court had not issued a formal order barring disclosures, but had insisted strongly that the parties cease talking about the investigation. Without attributing the information to a particular source, the article depicted the general chain of events that led to the grand jury probe and then indicated that during the summer and fall of 1978, the grand jury had subpoenaed financial documents from persons and organizations that had dealt with Lance, with the records of as many as forty-five persons and organizations being subpoenaed at one time.

The next article cited by Lance appeared in the *Atlanta Journal* on March 20, 1979. It reported that the Justice Department had appointed Paul Curran as "special counsel" to investigate loans made by National Bank of Georgia to President Carter's peanut warehousing business. Garnering the information from a report made by CBS news, the article revealed that Justice Department officials in Washington, D.C., had decided to seek an indictment from the grand jury against Lance and three of his associates when it reconvened the following week. The news report quoted "sources in the Justice Department" as stating that the indictment would charge Lance and his associates with violating federal banking laws while he was the chief executive officer of the First National Bank of Calhoun and the National Bank of Georgia, but would not allege any improprieties concerning the loans made to the Carter family's peanut warehouse operation. The article then discussed the loans in question, presented the justification for the appointment of a special counsel, and described Curran's background. The article concluded by briefly describing the history of the grand jury probe and by noting that the grand jury was thought to have completed its investigation three weeks previously of all matters except the warehouse loans.

Appearing in the *New York Times* on March 21, 1979, the third article repeated substantially the same information as the article in the *Atlanta Journal* on March 20, 1979, with some elaboration of details. It reported the appointment of Curran as a special counsel to investigate the National Bank of Georgia loan to the Carter peanut business, it revealed that a field team of Justice Department prosecuting attorneys had recommended that an indictment be sought against Lance for his banking activities, and it indicated that the charges against Lance might be filed by mid-April if Justice Department officials approved the field team's recommendation. The article then discussed the loan transactions which Curran would investigate, the initial investigation of the loans by the Federal Bureau of Investigation, the search for a suitable person to act as special counsel, and the primary questions raised about the loan transactions.

The fourth article appeared in the *Atlanta Journal* on March 21, 1979. The article stated that "a source close to the Lance probe" had indicated that the grand jury would not return an indictment of Lance in the next week as previously reported, but the Justice Department was preparing a team of attorneys to prosecute Lance. The article reported that formerly silent Justice Department officials now acknowledged that indictments would be forthcoming and would charge other defendants in addition to Lance. Quoting "officials," the article disclosed that no unforeseen delays had prevented the grand jury from voting on whether to indict Lance, and "an official close to the probe" stated that he had not expected the vote to occur in the next week. Attributing the information to "a Justice Department official close to the Lance investigation," the article revealed that the common practice of noti-

Denying the relief sought by Lance, the district court ruled that he had failed to present sufficient evidence of governmental misconduct to justify the relief sought or to warrant holding an evidentiary hearing on his charges. The court found that in the few instances where the articles specifically credited Justice Department sources for the information reported, the disclosures did not constitute a violation of Rule 6(e) or any other applicable secrecy provisions. The court dismissed allegations of misconduct based on information revealed by sources identified as "government sources" or "sources close to the investigation" as being too vague to warrant the inference that the material was disclosed by attorneys in the Justice Department. Relying in part upon a misreading of *In re Special April 1977 Grand Jury*, 587 F.2d 889 (7th Cir. 1978), the court rejected Lance's contention that the government's refusal to submit affidavits denying any wrongdoing on their part required relief. With regard to Lance's allegations of misconduct by grand jurors, the court held that the mere allegation that some grand jurors were seen conversing with reporters in the absence of any information even as to the identity of the person who witnessed the conversation was insufficient to justify the *in camera* examination of each grand juror requested by Lance. From this order denying the requested relief without an evidentiary hearing, Lance brought the present appeal.

## II. Appealability

The government questions whether the order of the district court denying Lance's motion for sanctions is an appealable final order under 28 U.S.C. § 1291. At the outset we conclude that the proceeding before us is in civil contempt. Of the several guides used to distinguish between civil and criminal contempt proceedings, the purpose of the proceeding is by far the most significant. Here, that purpose was so clearly remedial, that the proceeding must be characterized as civil. In *In re Special April 1977 Grand Jury*, 587 F.2d 889 (7th Cir. 1978), the Seventh Circuit dealt with a challenge to an appeal from the denial of a petition to terminate grand jury proceedings while the criminal trial process was still proceeding. In that case, the court concluded that the denial of the sanction requested for an alleged violation of Rule 6(e) was an appealable final order within the meaning of section 1291. The court reasoned that if the order were not reviewable the petitioner would be denied any meaningful opportunity to obtain appellate review of the lower court's disposition of his grievance or to correct the damage caused by the alleged unauthorized disclosures. 587 F.2d at 891–92. We adopt this same reasoning and hold that the order denying Lance's request for relief was appealable under section 1291.

The harm Lance alleges is capable of repetition, and if we were to require com-

fying persons who are the object of a grand jury probe that they will be indicted was not followed in this instance. The article then discussed the composition of the group of attorneys which was expected to prosecute Lance. Citing "a Justice Department source," it indicated that the grand jury would reconvene the following week in Atlanta to hear evidence, and that the investigation was currently focusing upon the loans made by the National Bank of Georgia to the Carter family peanut warehouse business. Finally, the article described the criticisms leveled by members of Congress at the restrictions placed on the special counsel's authority.

With a supplemental brief filed in support of his motion for sanctions, Lance submitted a fifth article. Published on March 30, 1979, by the *New York Times*, the article disclosed that "sources familiar with the case" had stated that Justice Department attorneys were attempting to negotiate a plea agreement with a particular executive of the National Bank of Georgia under which the executive would agree to testify in the prosecution of Lance. According to "well placed sources," the attempt to arrange a plea bargain began at a time when the chief officials of the Justice Department were reviewing a recommendation that Lance and other businessmen in Georgia be indicted. The article discussed the motion for sanctions which Lance had filed earlier in the week and which the district court had released to the public, and indicated that the bank executive's testimony could help to establish the existence of a conspiracy to misuse bank funds, citing "sources familiar with the Lance investigation." The article noted that widespread conjecture existed that the Justice Department would act in the Lance case within two weeks.

pletion of the discrete criminal trial processes before permitting review, we would deny any efficacious remedy. Acquittal or conviction would so obscure the claim of a personal remedy for grand jury irregularity as to render it meaningless. Lance's request for relief has practical viability only while the resultant criminal proceeding is executory. Unless we provide a remedy now, the harm would be rendered unreviewable. The situation is thus analogous to an interlocutory civil order which the *Cohen* doctrine would make appealable. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

■ At oral argument the government also challenged the appealability of the order denying relief on the ground that the return of an indictment by the grand jury against Lance subsequent to the district court's decision mooted his request for relief. The return of the indictment does moot Lance's request that the grand jury be dismissed. To attack the validity of the grand jury proceedings, he must now seek to dismiss the indictment. Lance's request that contempt sanctions be imposed upon the attorneys for the Justice Department and the United States Attorney's Office, however, is not mooted by his indictment. The attorneys are not parties to the ongoing criminal proceedings involving Lance but were the government officials charged with the duty of conducting the grand jury investigation. Moreover, because the grand jury process is now complete for Lance's case, there is no chance that any remedial relief granted could interfere with the grand jury's work. The order denying the requested contempt sanctions against them can be appealed by Lance. *Lamb v. Cramer*, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715 (1932); *Sanders v. Monsanto Co.*, 574 F.2d 198, 199 (5th Cir. 1978); *Southern Railway Co. v. Lanham*, 403 F.2d 119, 124 (5th Cir. 1968).

### III. Request for Contempt Sanctions

Lance contends that the court below erred in denying his motion for contempt sanctions without holding an evidentiary hearing. He contends that those parts of the articles that refer to factual determinations made by federal investigators, that describe specific substantive areas in which Lance might have violated the law, that depict specific areas into which the grand jury was inquiring, and that attribute to Justice Department officials' statements that Lance and other persons would be indicted reflect information which could only have been garnered from sources in the Justice Department.

■ The Supreme Court has consistently acknowledged the importance of the secrecy requirements imposed upon grand jury proceedings to the proper functioning of the grand jury system. *See Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979); *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958). Maintaining the confidentiality of grand jury proceedings protects several important interests of the government and of private citizens. First, if preindictment proceedings were conducted publicly, individuals who learned of their possible indictment might flee the jurisdiction or attempt to tamper with the grand jurors or witnesses appearing before them. Persons with information about crimes would be less willing to appear voluntarily and to speak fully and frankly, knowing that the individuals about whom they testify would be aware of that testimony. The rule of secrecy avoids injury to the reputation of those persons accused of crimes whom the grand jury does not indict. Finally, it encourages the grand jurors to investigate suspected crimes without inhibition and to engage in unrestricted deliberations. *See Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. at 219, 99 S.Ct. at 1673, 60 L.Ed.2d at 165 (1979); *United States v. Proctor & Gamble Co.*, 356 U.S. at 681 n.6, 78 S.Ct. at 986 n.6, 2 L.Ed.2d at 1081 n.6 (1958); *United States v. Malatesta*, 583 F.2d 748, 752 (5th Cir. 1978), *modified on other grounds*, 590 F.2d 1379 (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United*

*States v. Howard*, 569 F.2d 1331, 1335 (5th Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978).

Embodying this reasoning, F.R.Crim.P. 6(e)(1) provides that:

> A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the Government, or any person to whom disclosure is made under paragraph (2)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of rule 6 may be punished as a contempt of court.

F.R.Crim.P. 6(e)(1). To establish a violation of Rule 6(e) by Justice Department attorneys based on the news media reports about the grand jury inquiry, Lance must show that those reports contained information about "matters occurring before the grand jury" which was disclosed by "an attorney for the Government." This appeal will determine what constitutes a sufficient prima facie showing of a violation of Rule 6(e) to support a petition for sanctions.

This is a case of first impression in this circuit. We therefore turn to Rule 6(e) cases decided by other courts at the outset of our analysis. The parties have called to our attention six cases dealing with an alleged violation of Rule 6(e) by government disclosure of information about pending grand jury matters. Five of these cases are decisions by the United States District Court for the Southern District of New York and one is by the Seventh Circuit. Presenting similar factual situations to the one at bar, all of these cases involve allegations by a party that newspaper reports about the activities of a grand jury were based on information unlawfully disclosed by government attorneys. However, none of the cases cited deals with motions, such as Lance's, which seek contempt sanctions.

In *United States v. Kahaner*, 204 F.Supp. 921 (S.D.N.Y.1962), *aff'd*, 317 F.2d 459 (2d Cir.), *cert. denied* 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963) and 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963), the defendants sought dismissal of an indictment on the basis of preindictment publicity about the grand jury proceedings, which they alleged resulted from disclosures by the government. They presented to the court various newspaper articles, some of which attributed information to unidentified "officials." In response to the defendant's motion, the Justice Department attorney in charge of the investigation and prosecution of the defendant denied by affidavit that anyone associated with the government had revealed any information about grand jury matters to any persons and described the actions taken by the Justice Department from the beginning of the investigation to curtail any improper disclosures. Relying on this affidavit, the court held that the defendant's allegations of misconduct, which it characterized as resting on surmise and conjecture, were unsubstantiated and did not warrant dismissal of the indictment. 204 F.Supp. at 922–23.

*United States v. Sweig*, 316 F.Supp. 1148 (S.D.N.Y.), *aff'd*, 441 F.2d 114 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1970), presented allegations that the Justice Department and other agencies of the government were responsible for extensive preindictment publicity. The defendant sought dismissal of the indictment on the ground that the government-inspired publicity deprived them of their right to have an impartial grand jury determine whether probable cause existed for the return of an indictment. They submitted to the court numerous newspaper articles which "contained indications (references to 'official' informants and the like) that their sources were government people." 316 F.Supp. at 1154. Contending that the court must reject the defendant's motion as a matter of law, the government did not initially deny the allegations of misconduct by affidavit. Once the court suggested that the case could not be decided as a matter of law, however, the government responded with affidavits denying that any of the attorneys associated with the case

had revealed the information reported by the press. After examining the newspaper articles in light of the government's affidavits, the court ruled that the defendants had not shown "a concrete basis for inferring that government officials were responsible in any substantial degree for the unquestionably considerable amount of publicity preceding the indictment." *Id.* at 1154–55. While acknowledging that journalists generally preserve the confidentiality of their sources with great care, the court concluded that the unspecified "sources" cited by the newspaper articles were not sufficiently particularized to justify holding an evidentiary hearing on the allegations of misconduct and denied the requested relief. *Id.* at 1155.

In *United States v. Archer*, 355 F.Supp. 981 (S.D.N.Y.1972), *rev'd on other grounds*, 486 F.2d 670 (2d Cir. 1973), the defendants alleged that the government had intentionally released information to the press prior to and during the grand jury's deliberations for the purpose of inflaming the general public and of pressuring one or more of the defendants to cooperate with the government's investigation. Moving for dismissal of the indictment returned against them by the grand jury, the defendants cited fifteen newspaper articles and one editorial which initially reported the existence of an investigation of official corruption in various New York prosecutorial and judicial offices and later identified the defendants as subjects of the inquiry. The articles linking the defendants to the ongoing investigation attributed the information to "informed sources." By affidavit, the government attorneys denied that they were the source of any of the information disclosed. The district court concluded that the news reports cited by the defendants did not constitute sufficient prejudicial publicity to warrant dismissal of the indictment. It noted that of the two articles principally complained of by the defendants one was not released until after the indictment and did not report on the particulars of the investigation and the other cited only "informed sources" and did not disclose any information which was not a matter of public record. Re-

fusing to hold an evidentiary hearing, the court found that even if the defendants had been able to show that the "informed sources" were government officials, the matters disclosed would not justify the granting of any relief. 355 F.Supp. at 987–89.

In *United States v. Mitchell*, 372 F.Supp. 1239 (S.D.N.Y.), *appeal dismissed sub nom.*, *Stans v. Gagliardi*, 485 F.2d 1290 (2d Cir. 1973), the prayer for dismissal of the indictment was based in part upon an article appearing in the *New York Times* which reported that "sources close to the investigation" had revealed that the grand jury was expected to return an indictment of the defendants on the day that the article appeared. By affidavit the government attorney in charge of the investigation denied that anyone associated with the government had revealed any information about the grand jury proceedings and described the government's extensive efforts to maintain the secrecy of the grand jury proceedings. Relying on *Kahaner* and *Sweig*, the district court rejected the defendants' request for dismissal of the indictment and ruled that their conclusory allegations of misconduct did not warrant holding an evidentiary hearing. 372 F.Supp. at 1247–48.

*In re Grand Jury Subpoena Served upon Pedro Archuleta*, 432 F.Supp. 583 (S.D.N.Y. 1977), *reconsidered on subsequent motion*, 434 F.Supp. 325, involved a charge by Archuleta of misconduct by the government as one ground of a motion to quash a subpoena ordering him to testify before a grand jury investigating bombings carried out in New York by a radical subversive group. He contended that an article in the *New York Times* which discussed the investigation of the bombing reported confidential grand jury material which the government had revealed. The article reported that a memorandum prepared by the investigators had named Archuleta as a "prime suspect" in the theft of dynamite found in bombs which failed to explode and that he had been requested by a Chicago grand jury investigating similar bombings to provide voice samples for comparison with taped phone

calls announcing that the bombs had been planted. The United States Attorney's office that was conducting the New York investigation filed an affidavit denying that anyone associated with the government agencies involved in the inquiry had disclosed any information about the New York grand jury investigation. The court acknowledged the injurious effect of the disclosure upon Archuleta's reputation; yet it ruled that the misconduct alleged did not warrant quashing the subpoena to testify, noting that the proper remedy for unlawful disclosure of grand jury matters was the imposition of contempt sanctions on the offending party. The court did, however, consider the misconduct to be sufficiently egregious to warrant some remedial action by the court, and it ordered the Justice Department and the United States Attorney for the Southern District of New York to determine whether the improper disclosure originated within the federal government and to inform the court of the progress of this investigation within thirty days. 432 F.Supp. at 597–99. *See also United States v. Kearney*, 436 F.Supp. 1108, 1118–19 (S.D.N.Y.1977).

The final case cited by the parties is the decision of the Seventh Circuit in *In re Special April 1977 Grand Jury*, 587 F.2d 889 (7th Cir. 1978). In that case William Scott, who was the object of the ongoing grand jury investigation, requested the district court to terminate the grand jury proceedings because of improper disclosures made by persons associated with the government. Scott alleged that government personnel had revealed information about the grand jury proceedings to the news media and presented evidence of news media reports discussing grand jury matters and attributing the information to "government sources" or to "sources close to the investigation." In response the government filed affidavits by the persons involved in the investigation denying that they had disclosed the information reported by the news media. The Seventh Circuit upheld the dismissal without an evidentiary hearing of Scott's petition alleging violations of Rule 6(e) on the grounds that Scott had failed to

present sufficient proof that persons associated with the government were the source of the information and that much of the material revealed could have been disclosed during the investigation conducted by the government prior to the empaneling of the grand jury. Noting that a petitioner who seeks to interfere with the grand jury process bears a heavy burden of justifying such relief, the court found that Scott did not demonstrate with sufficient particularity the sources of the information disclosed. The court found the references in the article to "government sources" or "sources close to the investigation" to be insufficient to establish the government's involvement in the publicity since "news reporters, as all the world knows, invariably attribute the information they receive to 'confidential sources' and in connection with stories of this nature, to unnamed sources 'close to the investigation.'" The court declined to grant Scott the opportunity to conduct an investigation in the form of an evidentiary hearing or civil discovery so that he could make his allegations more definite. 587 F.2d at 892–93.

In determining whether a party alleging a violation of Rule 6(e) based upon news media reports has established a prima facie case, a court must consider several factors. First, there must be a clear indication that the media reports disclose information about "matters occurring before the grand jury." F.R.Crim.P. 6(e). *See In re Special April 1977 Grand Jury*, 587 F.2d 889 (7th Cir. 1978); *United States v. Archer*, 355 F.Supp. 981 (S.D.N.Y.1972), *rev'd on other grounds*, 486 F.2d 670 (2d Cir. 1973). Courts have interpreted the secrecy requirement imposed by Rule 6(e) to apply not only to information drawn from transcripts of grand jury proceedings, but also to anything which "may tend to reveal what transpired before the grand jury." *United States v. Armco Steel Corp.*, 458 F.Supp. 784, 790 (W.D.Mo.1978). *See also United States v. Gold*, 470 F.Supp. 1336, 1350 (N.D. Ill.1979). We construe the secrecy provisions of Rule 6(e) to apply not only to disclosures of events which have already

occurred before the grand jury, such as a witness's testimony, but also to disclosures of matters which will occur, such as statements which reveal the identity of persons who will be called to testify or which report when the grand jury will return an indictment.[4]

However, the disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e). *In re Special April 1977 Grand Jury*, 586 F.2d at 892; *United States v. Archer*, 355 F.Supp. at 989. A discussion of actions taken by government attorneys or officials—e. g., a recommendation by the Justice Department attorneys to department officials that an indictment be sought against an individual—does not reveal any information about matters occurring before the grand jury.[5] Nor does a statement of opinion as to an individual's potential criminal liability violate the dictates of Rule 6(e). This is so even though the opinion might be based on knowledge of the grand jury proceedings, provided, of course, the statement does not reveal the grand jury information on which it is based.[6]

Second, the article or articles must indicate the source of the information revealed to be one of those proscribed by Rule 6(e), which prohibits disclosure only by "[a] grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the Government, or any person to whom disclosure is made under paragraph (2)(A)(ii) of this subdivision."[7] Rule 6(e) does not prevent disclosures by a witness who testifies before the grand jury. *United States v. Radetsky*, 535 F.2d 556, 559 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *In re Investigation Before April 1975 Grand Jury*, 174 U.S.App.D.C. 268, 274 n.11, 531 F.2d 600, 606 n. 11 (D.C. Cir. 1976); *In re Langswager*, 392 F.Supp. 783, 788 (N.D.Ill.1975); *In re Minkoff*, 349 F.Supp. 154, 157 (D.R.I. 1972).

The information revealed in the news article must be considered in determining whether a Rule 6(e) source is identified. For example, if an article reports that following the presentation of specified evidence at a future time, the grand jury

4. Several of the articles cited by Lance disclose information about the grand jury inquiry by foretelling its future course of conduct. For example, the article appearing in the Atlanta *Journal and Constitution* on January 21, 1978, reported that the grand jury would soon begin to hear testimony about a specific loan made to Lance by a New York bank, named a specific witness who was expected to be called, and described a specific question which the witness would be asked. Since a presumption of correctness attaches (see *infra*), such statements of future events as matters which will occur must be accorded the status of facts.

5. Several of the articles complained of by Lance discuss actions taken by the Justice Department; however, such disclosures do not violate Rule 6(e). For example, the report in the *Los Angeles Times* article of October 21, 1978, that the Justice Department would not decide whether to seek an indictment against Lance until after the November election concerns only actions to be taken by the Justice Department, not the grand jury. The description in the article appearing in the *New York Times* on March 30, 1979, of the Justice Department's attempts to plea bargain with an associate of Lance in return for his testimony in a criminal proceeding against Lance also

discloses only the activities of the Justice Department.

6. Two of the articles presented to the district court by Lance discuss his potential criminal liability for his banking activities. The article published by the *New York Times* on April 28, 1978, reported that a source in the Justice Department had stated that Lance was more likely to be criminally liable for his dealings with the small banks in Georgia than for his more widely publicized activities involving New York and Chicago banks. The *Los Angeles Times* article of October 21, 1978, disclosed that a "source familiar with the grand jury inquiry" felt that Lance's use of a bank airplane for personal affairs would not result in a tax action against him. While these statements of opinion might be based on the source's knowledge of the grand jury proceedings, they do not disclose any information about the activities of the grand jury.

7. Paragraph 2 of Rule 6(e) creates limited exceptions to the rule prohibiting disclosures of grand jury matters, which are not relevant here.

plans to return an indictment against named persons, the attribution of such information to "sources close to the investigation" might, without more, suffice to establish a prima facie case of a Rule 6(e) violation by the attorneys conducting the investigation. The nature of the disclosure is such that it discloses the likely source.[8] On the other hand, if the article merely discusses the testimony of a witness before the grand jury, such information could have originated from a number of sources, including the witness himself or the grand jurors.[9] Occasional references in an article to government attorneys or officials as the source of information the disclosure of which would not violate Rule 6(e) cannot be used to show that more serious disclosures in the same article that are attributed to such vague origins as "sources close to the investigation" were made by the Justice Department in the absence of any indication from the nature of the material disclosed that some likelihood exists that it did originate with the Justice Department.[10]

 Disclosures which expressly identify when an indictment would be presented to the grand jury, the nature of the crimes which would be charged, and the number of persons who would be charged run afoul of the secrecy requirements codified in Rule 6(e).[11] It is not necessary for the article to expressly implicate the Justice Department as the source of the disclosures if the nature of the information disclosed furnishes the connection.[12]

8. For example, the article appearing in the *New York Times* on December 9, 1978, reported that "sources close to the investigation in Atlanta" had revealed that an indictment was not likely to result from the grand jury probe until the following year. Such a report raises the inference that the source of the information disclosed is the Justice Department or the attorneys conducting the grand jury investigation since they are the persons most likely to know when the presentation of evidence will be completed and when a proposed indictment might be voted upon by the grand jurors.

9. The best examples of disclosures that clearly reveal matters occurring before the grand jury but do not indicate their source are the articles appearing in the *Washington Post* and the *Atlanta Constitution* on December 8, 1978, which reveal that Lance had declined an invitation to testify before the grand jury. The most definite source mentioned by either article for this information is "two sources familiar with the investigation," and the information could have been made available by Lance's associates, by a grand juror, or by the Justice Department. While this report concerns grand jury matters, the source of the information is not sufficiently identified to warrant an inference of misconduct by the Justice Department.

10. For example, the article appearing in the *Los Angeles Times* on October 21, 1978, reports initially that "a senior Justice Department official" had indicated that the grand jury investigation was widening and that no decision would be made on whether an indictment would be sought until after the November elections. Garnering its information from "sources close to the case," "informed sources," and a "source familiar with the inquiry," the article later states that the grand jury had expanded its investigation to the period during which

Lance was Budget Director for President Carter, that the grand jury was seeking to determine whether Lance had misapplied bank funds and was using a computer to study the effect upon a bank of overdrafts by Lance and his relatives, and that the overdrafts would be traced to their conclusion. The information attributed to the Justice Department source did not discuss matters occurring before the grand jury, and the later disclosures which clearly violated Rule 6(e) cannot be inferred to have originated from the same source simply because of their inclusion in the same article.

11. The article of March 21, 1979, disclosed that Justice Department officials had acknowledged that the grand jury probe would result in indictments, that others besides Lance would be indicted, that no unforeseen delays had postponed the vote on the indictment by the grand jury, and that the general procedure of notifying targets of a grand jury investigation that they would be indicted had not been followed in this case. These disclosures clearly concern matters occurring before the grand jury, and the source of the disclosures is identified as officials in the Justice Department. When this article is read as true, it indicates that persons in the Justice Department violated Rule 6(e).

12. For example, the article published by the *Atlanta Journal and Constitution* on January 21, 1978, clearly discusses matters occurring before the grand jury when it reports that the grand jury would begin to hear testimony about a specific loan made to Lance by a New York bank, names a specific witness who is expected to be called, and describes a specific question which the witness will be asked. The article attributes this information to "sources familiar with the investigation"; yet the nature

██ The inability to show a definite source for some of the information contained in the articles might cause a prima facie case to fail if a responsive affidavit denying the allegations is made. At the same time, even with such a response, the detail as well as the seriousness of a disclosure may militate in favor of a further investigation of its source in the form of an evidentiary hearing.

██ While each article must be parsed individually, the testing for a prima facie case must also include a review which considers the whole spectrum of news articles. The precise attribution of a source in one or more articles may give definition to a vague source reference in others because of their context in time or content.

██ Third, in assessing the what and who of disclosure at the prima facie case stage, the court must assume that all statements in the news report are correct.[13] Given the broad first amendment protections accorded the news media, the assumption is a necessary safeguard to the enforcement of Rule 6(e). The complainant will almost never have access to anything beyond the words of the report. The respondent, on the other hand, is in the best position to know whether he is responsible for a violation.

██ Fourth, a court must consider the nature of the relief requested and the extent to which it interferes with the grand jury process. A criminal defendant who seeks to obtain dismissal of an indictment, a person subpoenaed to testify before the grand jury who requests the court to quash the subpoena, or the target of an ongoing grand jury investigation who seeks to have the grand jury dismissed bears a heavy burden in attempting to justify such relief.[14] A prima facie case to secure a hearing on whether to impose contempt sanctions upon government attorneys, however, does not require as strong a showing. Such a hearing carries little threat of conflict with the grand jury proceedings. Punishment for contempt of court is the sanction specifically authorized by Rule 6(e)(1) for violations of its provisions, and a contempt citation will generally provide an adequate remedy for such violation. *See United States v. Malatesta,* 583 F.2d 748, 753 (5th Cir. 1978), *modified on other grounds,* 590 F.2d 1379 (en banc), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United States v. Dunham Concrete Products, Inc.,* 475 F.2d 1241 (5th Cir.), *cert. denied,* 414 U.S. 832, 94 S.Ct. 65, 38 L.Ed.2d 66 (1973); *In re Grand Jury Subpoena Served upon Pedro Archuleta,* 432 F.Supp. at 599.

Fifth, the court must weigh any evidence presented by the government to rebut the assumed truthfulness of reports which otherwise make a prima facie case of misconduct. In all of the cases discussed above, the government official responsible for the investigation denied by affidavit that any person associated with the government had

---

of the material disclosed raises an inference that the Justice Department is responsible for the disclosure. Neither the grand jurors nor the witnesses subpoenaed to testify are likely to know not only the name of the witness expected to testify and the subject matter about which he would be questioned but also a particular question which he might be asked.

A similar inference can be made about the source of the information disclosed in the *Washington Post* article of September 21, 1978. Citing "several sources," it enumerates specific types of criminal conduct which the grand jury was focusing upon, discusses the contents of documents presented to the grand jury, reports information learned by the grand jury, and lists the particular banks whose activities were being investigated.

**13.** The Justice Department conceded at oral argument that such an assumption of correctness is required.

**14.** For example, in such situations courts have been reluctant to find that references by newspaper articles to general sources, such as "officials," "informed sources," or "sources close to the investigation," sufficiently implicated persons associated with the government to warrant such relief where those persons swore they had not breached grand jury secrecy. *In re Special April 1977 Grand Jury,* 587 F.2d at 892–93; *United States v. Mitchell,* 372 F.Supp. at 1247–48; *United States v. Archer,* 355 F.Supp. at 989; *United States v. Sweig,* 316 F.Supp. at 1153–55; *United States v. Kahaner,* 204 F.Supp. at 922–23.

disclosed information in violation of Rule 6(e). In every case but *In re Special April 1977 Grand Jury,* the court expressly relied upon the affidavit filed by the government in denying the requested relief without an evidentiary hearing on the charges of misconduct. *In re Grand Jury Subpoena Served upon Pedro Archuleta,* 432 F.Supp. at 599; *United States v. Mitchell,* 372 F.Supp. at 1247–48; *United States v. Archer,* 355 F.Supp. at 989; *United States v. Sweig,* 316 F.Supp. at 1154–55; *United States v. Kahaner,* 204 F.Supp. at 922–23. In *Sweig,* however, the government filed its responsive affidavit only after the district court suggested that it could not reject the defendant's motion as a matter of law in the absence of any denial of misconduct by the government. 316 F.Supp. at 1154.

Relying upon *Kahaner, Sweig, Archer,* and *Mitchell,* the district court concluded that the articles cited by Lance either did not sufficiently particularize the sources of information revealed or, where the information was specifically attributed to government officials, did not disclose matters occurring before the grand jury. However, this case differs from those cases relied upon by the district court in several respects. One form of relief requested by Lance was the imposition of contempt sanctions upon the government attorneys and employees associated with the grand jury investigation. In the prior cases the relief sought was either the dismissal of an indictment, *United States v. Mitchell,* 372 F.Supp. at 1246; *United States v. Archer,* 355 F.Supp. at 987; *United States v. Sweig,* 316 F.Supp. at 1153; *United States v. Kahaner,* 204 F.Supp. at 922; the dismissal of the grand jury, *In re Special April 1977 Grand Jury,* 587 F.2d at 890; or the quashing of a subpoena to testify, *In re Grand Jury Subpoena Served upon Pedro Archuleta,* 432 F.Supp. at 586. Rule 6(e) expressly authorizes the imposition of contempt sanctions as a punishment for a knowing violation of the secrecy rule, and the grant of such relief would not have interfered with the grand jury's ongoing investigation.

Unlike the parties seeking relief in the prior cases, Lance has attempted several times to have the court halt prejudicial disclosures of confidential grand jury matters appearing in the news media. When the publicity first began to appear, he properly sought relief from the district court. The relief granted proved ineffective. Lance then filed this motion for sanctions following the appearance of several articles which cited Justice Department officials as the source of the information disclosed. Unlike prior cases, the Justice Department and the United States Attorney's office refused a request by Lance that they submit affidavits denying that they or their staff had discussed grand jury matters with the press.

■■■ In light of the relief sought by Lance and the government's failure to file an affidavit denying the charges of misconduct, we conclude that the newspaper articles presented by Lance to the district court sufficiently established a violation of Rule 6(e) by persons associated with the Justice Department or the United States Attorney's Office for the Northern District of Georgia to prevent the district court from dismissing Lance's motion for sanctions as a matter of law. The articles contain numerous disclosures of information about the grand jury proceedings, and several of the articles identify either expressly or by inference the government attorneys as the source of the information.[15]

Examining all of the materials presented to the district court as a whole, we conclude that Lance made a sufficient prima facie

---

15. For example, the articles appearing in the *Atlanta Journal* on March 20, 1979, and March 21, 1979, specifically attribute the information reported to sources in the Justice Department. The first article indicated that "sources in the Justice Department" had disclosed that the Department would request the grand jury to indict Lance and three other persons on charges of violating federal banking laws. The indictment would be based on Lance's activities while he was chief executive of the First National Bank of Calhoun and the National Bank of Georgia, but would not allege any improprieties in connection with the loans made to the Carter peanut warehouse.

showing of a violation of Rule 6(e) to warrant an evidentiary hearing in the absence of any affidavit by the Justice Department attorneys denying that they, their associates, or their superiors divulged the information appearing in the newspaper articles. Other courts have found affidavits of denial by the responsible government officials sufficient to counter any allegations of improper conduct under Rule 6(e); yet the relief sought in those cases was not contempt sanctions but a serious interference with the grand jury process. We leave for decision after a factual analysis by the district court the question whether the showing made by Lance would still warrant an evidentiary hearing even if a responsive affidavit should be filed by government counsel.

REVERSED and REMANDED.

KRAVITCH, Circuit Judge, dissenting:

I respectfully dissent. In my opinion, the denial of the motion for contempt is not an appealable order under 28 U.S.C. § 1291 and, therefore, this court lacks jurisdiction.

Analytically, appealability first turns on whether the contempt sought is criminal or civil. Denial of a criminal contempt motion is non-appealable. Denial of civil contempt is appealable by a non-party. If the appellant is a party, however, denial of a civil contempt is not appealable at this juncture because a *party* has an opportunity for meaningful review at the conclusion of the case in chief unless the contempt action is so collateral to the litigation that immediate appeal is appropriate. Thus analyzed, the instant denial is not appealable.

Contempt is the normal remedy for breach of grand jury secrecy pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure. *See United States v. Malatesta,* 583 F.2d 748 (5th Cir. 1978), *modified on other grounds,* 590 F.2d 1379 (5th Cir. 1979) (en banc). The court in *Malatesta,* however, did not reach or decide whether the contempt discussed was more appropriately criminal than civil.[1] This distinction is important because a criminal contempt action is governed by the rules applicable to criminal proceedings generally; no appeal may be taken from a judgment in favor of the alleged contemnor, including a denial of the motion.[2] Therefore, if the contempt action at issue here is criminal, there can be no appeal.[3] *Lamb v. Cramer,* 285 U.S. 217, 220, 52 S.Ct. 315, 76 L.Ed. 715 (1932); *United States v. Sanges,* 144 U.S. 310, 323, 12 S.Ct. 609, 36 L.Ed. 445 (1892); *Wingert v. Kieffer,* 29 F.2d 59 (4th Cir. 1928); *United States ex rel. West Virginia-Pittsburgh Coal Co. v. Bittner,* 11 F.2d 93 (4th Cir. 1926).

The majority concludes that the contempt sought here is clearly civil rather than criminal. I disagree that the answer is so clear. No bright line distinguishes the two; however, there are criteria by which the nature of the proceeding can be determined. One factor is the character of the offense. If the purpose of the sanction is to vindicate the public interest, the proceeding is criminal in nature; if it is to remedy a wrong done to a particular individual, it is civil. Another factor is the remedy prayed for. If the proceeding is to result in punitive sanctions, by unconditional fine or imprisonment, it is considered criminal. *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 31

---

1. In *In re Grand Jury Subpoena Served upon Archuleta,* 432 F.Supp. 583 (S.D.N.Y.1977), *reconsidered on subsequent motion,* 434 F.Supp. 325 (1977), the court ordered an investigation by the Justice Department of the alleged secrecy violations. That the government instigated the investigation implied that the contempt for breach of grand jury secrecy is criminal.

2. Additionally, appellant's standing to appeal the instant denial can be questioned. In *Ramos Colon v. United States Atty. for D. Puerto Rico,*

576 F.2d 1 (1st Cir. 1978), the court held that a defendant whose indictment had been dismissed lacked the standing to appeal a denial of a motion for sanctions against the prosecuting attorney for prosecutorial misconduct.

3. Unlike a denial, a criminal contempt citation is immediately appealable by the contemnor without awaiting a final judgment in the case in chief. *In re Merchants' Stock and Grain Co.,* 223 U.S. 639, 32 S.Ct. 339, 56 L.Ed. 584 (1912).

S.Ct. 492, 55 L.Ed. 797 (1911); [4] *Duell v. Duell,* 85 U.S.App.D.C. 78, 178 F.2d 683 (D.C.Cir.1949). If, on the other hand, the remedy is compensatory or coercive to secure performance of an obligation,[5] the proceeding would be civil. Even coercive imprisonment is civil because the defendants "carry the keys of their prison." *See In re Nevitt,* 117 F. 448, 461 (8th Cir. 1902).

Here the prohibited action was the alleged disclosure of matters presented to the grand jury. In *United States v. Malatesta,* 583 F.2d 748 (5th Cir. 1978), the court identified four traditional reasons for clothing the grand jury process in secrecy: (1) to protect the accused from escaping and tampering with witnesses; (2) to encourage witnesses to appear and speak freely; (3) to encourage jurors to engage in uninhibited investigation and deliberation; and (4) to protect the reputation of an accused who is *not* indicted. It is apparent that all but factor (4) benefit the public interest in insuring the independence of the grand jury process. Factor (4) does not provide a basis

for relief here because the appellant has been indicted.[6] Therefore because the remaining reasons for grand jury secrecy protect public interests, it can be inferred from the nature of the offense that the contempt proceeding is criminal.

In addition to character of the violation, the nature of the contempt depends upon whether the sanction imposed is coercive and conditional or punitive. *Gompers v. Buck's Stove & Range Co., supra.* Because the instant case involves *denial* of the motion for sanctions rather than an *imposition* of sanctions, we are limited in our analysis of the nature of the sanctions to the prayer for relief;[7] it is impossible to determine from the motion itself whether the sanctions sought are punitive or remedial.[8] Again because policies of secrecy are for the benefit of public rather than private interests, implying that a contempt action for violation would be criminal, appellant, at least, should have demonstrated that the remedies sought were remedial[9] rather than punitive.

---

4. In *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911), the Supreme Court identified these and additional factors. If the contempt action results from the doing of a forbidden act, the action is criminal. If in contrast, the alleged contemnor has failed to do what he has been ordered to do, then the contempt is civil. Applying this analysis to the instant case results in the contempt being criminal because the attorneys are alleged to have breached grand jury secrecy, which is forbidden. The Supreme Court also stated that the style of the case is important: criminal actions are brought in the name of the United States. This factor is not dispositive in the Fifth Circuit, however. *See Southern Railway Co. v. Lanham,* 403 F.2d 119, 125 (5th Cir. 1968).

5. In 28 U.S.C. § 1826, Congress has apparently provided an independent route for appeal for those conditionally incarcerated. *See In re Grand Jury Investigation,* 542 F.2d 166 (3rd Cir. 1976).

6. This motion was filed on March 22, 1979 and the appellant was indicted on May 23, 1979. Although when the motion was filed the appellant did have a viable personal interest protected by Rule 6(e) because he had not been indicted, the question is now moot by virtue of the indictment. This is not as harsh as it seems. The reason for protecting the reputation of the

unindicted is that, had damaging statements been leaked, an unindicted person would have no forum to rehabilitate himself and a civil contempt would be the only mechanism available to rectify the breach. *See In re Special April 1977 Grand Jury,* 587 F.2d 889 (7th Cir. 1978). A person who has been indicted will have the full public vindication of public trial on the merits.

7. Even at oral argument, the attorneys for the appellant still had not focused on what remedies were being sought. When questioned as to what relief the court could now order given that the appellant was indicted, the attorneys merely replied that they wanted a hearing.

8. A fair reading of the motion yields three claims:

 (1) That all members and staffs of the Justice Department and the local U.S. Attorney's office who participated in the grand jury show cause why they should not be held in contempt.

 (2) That an in camera hearing be held to determine whether the jurors themselves had been talking to the press.

 (3) That such sanctions be imposed and such actions taken as will fully and appropriately protect the constitutional rights of the petitioner.

9. In *Gompers* the Supreme Court stated:

It is evident that if the present motion is construed to be one for criminal contempt there can be no appeal from the denial. *United States v. Sanges, supra.* However, even if we adopt the reasoning of the majority that the contempt sought is civil,[10] this appeal is not proper.

An order holding a *party* to a lawsuit[11] in civil contempt is interlocutory and normally not appealable until final judgment of the case in chief. *Doyle v. London Guaranty Co.,* 204 U.S. 599, 27 S.Ct. 313, 51 L.Ed. 641 (1907). Inferentially, the *denial* of such a motion is also not appealable by a

party to the lawsuit. *See Union Tool Co. v. Wilson,* 259 U.S. 107, 110–11, 42 S.Ct. 427, 66 L.Ed. 848 (1922). The obvious reason underlying this doctrine is that a party to ongoing litigation will have another, more appropriate, opportunity to seek review of the court's action when the entire case is appealed.[12] This rationale preserves the party's right to appeal and also diminishes piecemeal litigation with its attendant disruption of the ongoing case. Although it is true that a grand jury proceeding is "party-less" the Supreme Court has held that this distinction is immaterial in deter-

In this case the alleged contempt did not consist in the defendant's refusing to do any affirmative act required, but rather in doing that which had been prohibited. The only possible remedial relief for such disobedience would have been to impose a fine for the use of complainant, measured in some degree by the pecuniary injury caused by the act of disobedience.

221 U.S. at 444–45, 31 S.Ct. at 499. This analysis applies with equal force to the instant case yet nowhere in his motion has the appellant sought money damages. Indeed, because appellant's reputation may be rehabilitated through his trial, determination of even compensatory damages would be inappropriate until after the trial has concluded.

**10.** The appellant's third claim for relief arguably prays for personal relief implying he is seeking civil contempt. There are several problems with this claim, however. A reading of the entire prayer discloses that appellant seeks protection of his constitutional rights, specifically those secured by the fourth, fifth and sixth amendments. Protection of the constitutional rights of a target is not among the purposes of grand jury secrecy. Moreover, such relief may not be available to redress the violation of 6(e). *See* n. 9 *supra. See also United States v. Malatesta, supra.* Furthermore, appellant's claim for redress of constitutional violations is not yet ripe. For example, appellant contends that his right to due process as guaranteed by the Fifth Amendment was violated because the grand jury considered the secrecy breaches of the Justice Department as evidence. If the information leaked was actually before the grand jury, then the grand jury would already be aware of the information and no prejudice could have resulted. If the argument is rather that the breaches caused a "self-fulfilling prophecy," then the appellant can move that the indictment be quashed at the appropriate time prior to trial. On the other hand, if the issue is that the breaches fomented pretrial publicity, appellant can seek a change of venue. Both of these would be reviewable

on appeal and are much more responsive to appellant's constitutional claims than contempt action.

**11.** In the usual case, the ongoing lawsuit is also civil rather than criminal. Appealability should not turn on this distinction because a civil contempt action and a criminal proceeding are not so unrelated that no rational purpose would be served by waiting until the criminal proceeding is final. As will be developed, depending on the sanctions sought and the purposes of the relief, the remedies could be very disruptive of the criminal proceeding. *See* n. 17 *infra.* Moreover, it is possible that the breaches could be remedied during trial. For example, if the gravamen of the claim is that the breach of secrecy enflamed the public to such an extent as to preclude a fair trial, the trial court could order a change of venue, and thus remedy the breach prior to trial. Thus, appealability should not depend on whether the ongoing litigation is criminal or civil but rather on the existence of a later opportunity for review.

**12.** This rule is open to the criticism that if the disappointed party to the contempt action wins the case in chief there would be no appeal and hence no review of the earlier contempt action. If there has been a contempt citation, however, the contemnor would appeal regardless of the outcome of the case in chief to recover whatever damages had been awarded. If the contempt motion is denied and the party who sought the motion prevails eventually, the eventual damages would probably include those sought in the contempt action. Because the case in chief involved here is criminal, all damages to the appellant may be cured if he is acquitted. *See Ramos Colon v. United States Atty. For D. Puerto Rico,* 576 F.2d 1 (1st Cir. 1978), n. 17, *infra.*

mining appealability.[13] *Cobbledick v. United States,* 309 U.S. 323, 327, 60 S.Ct. 540, 84 L.Ed. 783 (1940). Furthermore, when a target has been indicted, as here, the criminal proceeding is definite as to parties and the party-less nature of a grand jury proceeding has disappeared.

The lack of an opportunity for review was the basis for the Seventh Circuit's decision in *In re Special April 1977 Grand Jury,*[14] relied upon by the majority. Factually, the case differs from the instant case, however, in that the target in *April 1977 Grand Jury* had not yet been indicted leaving the appellant in a different procedural posture than the instant case. The distinction is important because in *April 1977 Grand Jury* the court concluded [15] that an unindicted target has no other meaningful opportunity for review because no trial will occur from which final adjudication on appeal can be taken.[16] Additionally, the unindicted target has no opportunity to rehabilitate his reputation at trial. Thus, the appeal did not run counter to the policies against piecemeal litigation and disruption of the judicial process. Moreover, protection of the reputation of the unindicted or innocent accused is one of the policies behind grand jury secrecy. *See Douglas Oil*

*Co. v. Petrol Stops Northwest,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979); *United States v. Malatesta, supra.* Because the target here has been indicted, he will have an opportunity to vindicate himself before a jury of his peers or to appeal at the termination of the case in chief.[17]

The majority has concluded that the order is appealable on the theory that the alleged defendants in the contempt proceeding are *non-parties*, being government employees appearing as attorneys for the government. Even if we accept the proposition that, in the instant case, the prosecuting attorneys are non-parties, appealability does not turn upon that status. In determining appealability, it is the status of the *appellant* rather than that of the appellee which is dispositive. Thus, a non-party may immediately appeal a contempt citation, yet a contempt citation against a *party* may not be appealed prior to final judgment. *See* text accompanying n. 11, *supra.* The distinction is logical—a non-party has no opportunity for review besides an immediate appeal whereas a party can have the order reviewed as part of the appeal of the case in chief. Analogously, a denial of contempt against a non-party cannot be appealed by a party until the termination of the case in

13. For a general discussion of appealability in the grand jury context, see Note, 65 *Va.L.Rev.* 573 (1979).

14. 587 F.2d 889 (7th Cir. 1978).

15. The court also relied on the fact that denials of motions to quash indictments are not appealable should the target be indicted. 587 F.2d at 892. The court was correct only if it meant that motions to dismiss are not immediately reviewable. *See United States v. Doucet,* 461 F.2d 1095 (5th Cir. 1972). Because motions to dismiss are eventually reviewable, *United States v. Lee,* 413 F.2d 910 (7th Cir. 1969), should the appellant be indicted and convicted, the court was on weaker analytical ground since another opportunity for review would exist. There is even an argument that because the appellant *could* still be indicted the court should have waited until the grand jury proceeding was completed before determining whether the denial of the motion was appealable because only then could it be determined that the appellant would have no opportunity for review.

16. Indeed, the court distinguished an earlier case, *In re Special March 1974 Grand Jury,* 541 F.2d 166 (7th Cir. 1976), in which it held that an order denying an evidentiary hearing into grand jury abuse was not immediately appealable because the appellant in the earlier case

> failed to demonstrate how a denial of review will leave it powerless eventually to correct an injustice on a plenary review after the grand jury has ceased its investigation and the criminal trial has been conducted.

*Id.* at 170.

Similarly, the appellant here has failed to show that his rights could not otherwise be protected. *See* nn. 10, 11 *supra.*

17. There may be some Rule 6(e) damage that is not capable of remedy by an innocent verdict. For example, confidential business records could have been divulged to the target's financial detriment. This type of damage should not and cannot be subsumed by a jury trial. Of course, this breach of secrecy might also form the basis of an independent tort action.

chief.[18] Thus, even if the appellees are properly considered non-parties to the criminal proceedings against Lance, the denial of the motion for sanctions is non-appealable at this time.

Furthermore, the claim of the appellant is not limited to a discrete group of government officials who might properly be considered non-parties, but is against "all attorneys, agents and employees of the United States Department of Justice and the United States Attorneys Office for the Northern District of Georgia who are or have been involved in any manner whatsoever in the federal grand jury investigation of the banking practices and related activities of certain northern Georgia banks." This overly-broad language presumably includes the Attorney General within its scope.[19] Rather than seeking redress from mere government officials, the appellant has implicated the hierarchy of the Justice Department itself, a branch of the Federal Government which is presumably a "party" to a grand jury investigation and to a criminal trial. Moreover, the appellant obviously considered the appellees parties to the grand jury proceeding as he failed to initiate a separate proceeding with summons and service, steps which would be necessary in a contempt action against a non-party in order to comport with the requirements of due process.[20]

In support of the argument that appeal is proper against the non-party government attorneys, the majority relies chiefly[21] on the Supreme Court decision in *Lamb v. Cramer,* 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715 (1932).[22] A close reading of *Lamb* discloses that such reliance is misplaced. First, *Lamb v. Cramer* involved an issue more akin to res judicata than to appealability of non-final orders. Second, the case in chief involved in *Lamb* had terminated in final judgment prior to the appeal from the

---

18. The analogy is also symmetrical. Clearly the denial of a motion for contempt against a party by a non-party should be immediately reviewable. This occurrence is not as exotic as it might appear. For example, the government may be successful in securing a temporary injunction in a civil rights case. If the injunction is violated by the defendant and an individual is harmed, that person would have the right to bring a contempt action against the party in violation. A denial of such a motion should be immediately reviewed because there is no other opportunity for appellate review.

19. *See* n. 2 of the majority opinion, the fourth article referenced.

20. *See* 11 Wright & Miller, *Federal Practice and Procedure* : Civil § 2960 at 589 (1973).

21. The majority also cites *Sanders v. Monsanto Co.,* 574 F.2d 198 (5th Cir. 1978) and *Southern Railway Co. v. Lanham,* 403 F.2d 119 (5th Cir. 1968). Both cases are irrelevant to the question presented here. *Sanders* involved contempt for violation of a consent order. The court held that the consent order was final for purposes of reviewing the civil contempt. *Southern Railway* involved an appeal of a court order holding the defendant in criminal contempt. Of course that holding was appealable by the contemnor. *Union Tool Co. v. Wilson,* 259 U.S. 107, 42 S.Ct. 427, 66 L.Ed. 848 (1922).

22. *Lamb* involved a denial of a contempt motion sought against an attorney of a party in a suit in equity. During the pendency of the suit, the attorney received, as compensation, some of the property that was the subject of the suit. The judge did not deny the motion for contempt until *after* final judgment had been rendered. The final judgment of the case in chief was not appealed, however. Upon appeal from the denial of the contempt motion, the attorney contended that the denial could not be appealed because there had been no appeal from the case in chief. The Supreme Court punctured this defense:

> The proceeding, based on transactions had with the property involved in the principal suit, was in aid of that suit and of any decree which might be entered in it. It could be maintained, independently of the suit, either before or after the decree was entered, so long as it remained unsatisfied; and the appeal was not dependent upon an appeal from the decree.

*Id.* at 221, 52 S.Ct. at 317. Although the Court did hold that the denial was a final order, it is far from clear that the Court was holding that every such denial is a final order regardless of whether the case in chief was still ongoing. To read the decision as broadly as the majority would require that every denial or award of relief in a contempt proceeding is a final order and appealable, yet it is clear such is not the case. For example, even if a party is *held* in civil contempt the order is not appealable. *Doyle v. London Guaranty Co.,* 204 U.S. 599, 27 S.Ct. 313, 51 L.Ed. 641 (1907). All such motions are not appealable.

denial of the motion for contempt so that the denial itself was final.

Although the order involved here is interlocutory, review would be proper if the denial of the motion is collateral to the ongoing criminal proceedings. Under 28 U.S.C. § 1291, the court of appeals has jurisdiction to review only final judgments.[23] The Supreme Court has authorized appeal of collateral orders, however, recognizing that there exists a "small class [of orders] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–1226, 93 L.Ed. 1528 (1949). The Court implied that review would be restricted to orders presenting "serious and unsettled question[s]." *Id.* at 547, 69 S.Ct. 1221. The Fifth Circuit has interpreted this rule to limit interlocutory appeal to "an order otherwise not appealable, determining substantial rights of the parties which will be irreparably lost if review is delayed until final judgment . . . ." *United States v. Wood,* 295 F.2d 772, 778 (5th Cir. 1961), *cert. denied,* 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9 (1962).

In determining whether an order is collateral, we are cognizant of the policies of minimizing piecemeal litigation and disruption of the orderly administration of justice. "Adherence to this rule of finality has been particularly stringent in criminal prosecutions because 'the delays and disruptions attendant upon intermediate appeal' which the rule is designed to avoid 'are especially inimical to the effective and fair administration of the criminal law.'" *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651, 657 (1977). This policy applies to grand jury proceedings as well as trials. In the language of the Supreme Court:

> The proceeding before a grand jury constitutes "a judicial inquiry," *Hale v. Henkel,* 201 U.S. 43, 66 [, 26 S.Ct. 370, 375, 50 L.Ed. 652] (1906), of the most ancient lineage. . . . The duration of its life, frequently short, is limited by statute. It is no less important to safeguard against undue interruption the inquiry instituted by a grand jury than to protect from delay the progress of the trial after an indictment has been found. Opportunity for obstructing the "orderly *progress*" of investigation should be no more encouraged in one case than in the other. That a grand jury has no definite litigants and that none may emerge from it, is irrelevant to the issue.

*Cobbledick v. United States,* 309 U.S. 323, 327, 60 S.Ct. 540, 542, 84 L.Ed. 783 (1940).

The appellant has failed to demonstrate that the present order satisfies the above criteria for collateral orders. Because the appellant in his prayer for relief has not

**23.** Certain interlocutory appeals are permitted by 28 U.S.C. § 1292 which provides in pertinent part:

(a) The courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

. . . . .

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

Part (b) has not been complied with by the district court and is otherwise of doubtful application. It is possible that § (a)(1) could have been applicable had appellant been more specific in his prayer for relief.

identified what sanctions he would ultimately seek, it is impossible to determine whether this action is "independent of the cause itself." *See e. g., Lance v. Plummer,* 353 F.2d 585 (5th Cir. 1965), *cert. denied,* 384 U.S. 929, 86 S.Ct. 1380, 16 L.Ed.2d 532 (1966). Recognizing that the probability of disruption of the criminal investigation is relevant to appealability, the majority reasons that disruption is improbable because only contempt sanctions are sought. The majority, at best, is using a cloudy crystal ball, however, because the district court has very broad powers in fashioning contempt sanctions in order to remedy breaches of court orders.[24] Moreover, the appellant specifically prays for relief that would "fully and appropriately protect the constitutional rights of the petitioner." He further states that he has "been denied his rights under the fourth, fifth and sixth amendments to the United States Constitution." These prayers are very telling in terms of whether the motion is truly collateral. It is obvious that the appellant is seeking protection of rights in the criminal context which are not collateral to an eventual criminal proceeding.[25] Furthermore, because appellant will have an opportunity to air his constitutional grievances at trial, this court will have an opportunity to review such constitutional claims on appeal of the entire case.[26]

. The foregoing should not be construed as precluding review of a district court's supervision of the grand jury process; rather *appeal* is simply not the appropriate route. A better procedure to cure abuses of discretion or errors by the district court in supervising a grand jury is mandamus. *See In re Grand Jury Subpoenas,* 581 F.2d 1103 (3d Cir. 1978). Mandamus is more appropriate for three reasons: (1) Mandamus is discretionary with *this* court and not automatic as is appeal, and consequently has a lesser impact on the administration of the grand jury proceeding. (2) Mandamus benefits the movant because relief can be granted at a more meaningful time during grand jury deliberations rather than after an indictment has been returned, as in the instant case. (3) Mandamus will not spawn more appealable orders because a granting of the writ of mandamus is not a finding that the entire action is collateral to the main event. Additionally, prospective protection of the grand jury process can be accomplished by

24. For example, suppose the appellant seeks an order from the court barring the present attorneys from future participation in the case or an order requiring that a "Chinese wall" be erected between the front line attorneys and their Justice Department supervisors or that the government be made to publically retract or apologize to the target for disclosures. It is evident that these sanctions go to the very heart of the administration of the grand jury proceedings with the attendant possibilities of delay and disruption. On the other hand, suppose the appellant seeks a dismissal of the grand jury or the quashing of the indictment. These are motions that can be more appropriately made before the district court prior to trial. That is not to say that there could not be a civil contempt motion sufficiently collateral to grand jury proceedings to permit appeal. For example, if the claim was solely for remedial relief, that is, damages for damage to reputation or loss of business information confidentiality caused by government disclosures, *cf. Petrol Stops Northwest v. United States,* 571 F.2d 1127 (9th Cir. 1978) rev'd, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979) (Corporation has standing to object to disclosure of grand jury evidence involving confidential business information), then a hearing on the merits of this claim would not in any way interfere with ongoing grand jury proceedings and would conform to the policies of grand jury secrecy that benefit the target. Indeed, it may be that appellant is limited to compensatory money damages. *See* n. 9 *supra.* Based on the motion itself it is impossible to conclude that this appeal is collateral to the grand jury proceedings.

25. *See* n. 10 *supra.*

26. Beyond creating a new category of appealable orders which could be abused, the court has also failed to address the result of accepting this appeal. If after requiring affidavits the court once more denies relief, is the court's determination again appealable? Or, for example, if the appellant seeks the quashing of the indictment as the result of a hearing and the court refuses, is the denial appealable? It would be difficult to argue with logic that a decision not to hold a hearing is appealable but that the ultimate denial of relief is not. However, the denial of a motion to quash is not appealable unless on double jeopardy grounds. *United States v. McDonald,* 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978).

injunctive relief,[27] the denial of which is appealable under 28 U.S.C. § 1292. Therefore, through mandamus and injunction the administration of grand jury proceedings can be scrutinized and the personal interests of targets can be protected without creating a new category of appealable orders.

For the foregoing reasons I conclude that the appeal should have been dismissed for lack of jurisdiction.

---

27. *See* n. 17 *supra* for examples of injunctions that would protect the rights of the target prospectively.